CITY OF NEW YORK, et al., Plaintiffs,

v.

BERETTA U.S.A. CORP.,
et al., Defendants.

Joan Truman Smith, Plaintiff,

v.

Bryco Arms, et al., Defendants.

Jaquione Johnson, Plaintiff,

v.

Bryco Arms, et al., Defendants.

Nos. 00 CV 3641 JBW CLP, 02 CV 3029 JBW CLP, 03 CV 2582 JBW CLP.

United States District Court,
E.D. New York.

May 19, 2004.

Kenneth Marder, Taub & Marder, Elisa Ann Barnes, Law Office of Elisa Barnes, Eric Proshansky, Gail P. Rubin, Marjorie H. Mintzer, Corporation Counsel of the City of NY, Richard J. Costa, New York City Law Department, New York City, Elizabeth Schickedanz Haile, Brian J. Siebel, Brady Center to Prevent Gun Violence Legal Action Project, Dennis A. Henigan, Jonathan E. Lowy, Rachana Bhowmik, Center to Prevent Handgun Violence, Washington, DC, for Plaintiff.

Elliot M. Schachner, United States Attorneys Office, Brooklyn, NY, Lawrence S. Greenwald, Gordon, Feinblatt, Rothman, Hoffberger, Hollander, LLC, Robert Edward Scott, Jr., Baltimore, MD, Brian Preston Heermance, Morrison, Mahoney & Miller, LLP, Paul L. Kassirer, Lester, Schwab, Katz & Dwyer, LLP, Jeffrey Martin Malsch, Renzulli, Pisciotti & Renzulli, LLP, John F. Renzulli, Renzulli & Rutherford, LLP, Leonard S. Rosenbaum, Scott Charles Allan, Renzulli, Pisciotti & Renzulli, LLP, Thomas Patrick Battistoni, Balber, Pickard, Battistoni, Maldonado & Van Der Tuin, PC, Robert Laurent Joyce, Wilson, Elser, Moskowitz, Edelman & Dicker, Alan Mansfield, Joel M. Cohen, Greenburg Traurig, LLP, Anne Elizabeth Cohen, Debevoise & Plimpton LLP, John Joseph McCarthy, III, McCarthy Law Firm, PLLC, New York City, Jamie Huffman Jones, Jonann E. Coniglio, Friday, Eldredge & Clark, LLP, Little Rock, AR, Thomas E. Fennell, Michael L. Rice, Jones Day, Dallas, TX, Thomas E. Healy, Pino & Associates, LLP, White Plains, NY, Bridgette E. Eckerson, Timothy A. Bumann, Budd Larner, P.C., Atlanta, GA, Budd Larner, Prescott L. Nottingham, Budd, Larner, Rosenbaum, Greenberg & Sade, Kathleen C. Marchetti, Budd Larner, P.C., Short Hills, NJ, Michael J. Zomcik, Tarics & Carrington, PC, Houston, TX, Jeffrey Scott Nelson, Shook, Hardy & Bacon LLP, Kansas City, MO, Stacey Elaine Deere, Shook, Hardy & Bacon LLP, Kansas City, MS, James Philip Dorr, Sarah Liddell Olson, Wildman, Harrold, Allen & Dixon, Richard J. Leamy, Jr., Weidner & McAuliffe, Ltd., Chicago, IL, William Edward Vita, Gallagher, Gosseen, Faller, Kaplan & Crowle, Garden City, NY, Christopher Michael Chiafullo, Saiber, Schlesinger, Satz &

Goldstein, Newark, NJ, Scott L. Braum, Timothy Rockwell Rudd, Scott L. Braum & Associates, Dayton, OH, for Defendant.

### ORDER

POLLAK, United States Magistrate Judge.

Plaintiffs Joan Smith, as administratrix of the estate of Anita Smith, and Jaquione Johnson (collectively, the "Wendy's plaintiffs") bring their actions as a result of injuries suffered during a violent robbery at a Wendy's restaurant in Queens, New York, on May 25, 2000. (*See* Wendy's Pls.' Letter, dated April 2, 2004, at 1). The Wendy's plaintiffs allege that the manufacturers, distributers, and retailers of the weapon used in the robbery are liable for the injuries plaintiffs suffered as a result of the use of that weapon during the course of the robbery.[1] The Wendy's plaintiffs allege that the Wendy's defendants employed negligent marketing and distribution practices that proximately caused plaintiffs' injuries. (*See Johnson* Compl. ¶¶ 101–15; *Smith* Compl. ¶¶ 55–82). In addition, the Wendy's plaintiffs allege that the Wendy's defendants' marketing and distribution practices have created a public nuisance by selling firearms, knowing or having reason to believe that a substantial number of their firearms would be used by criminals in the course of illegal activities. (*See Johnson* Compl. ¶¶ 116–22; *Smith* Compl. ¶¶ 83–89). The Wendy's plaintiffs allege that despite receiving large numbers of requests from the Bureau of Alcohol, Tobacco and Firearms ("BATF") for trace data, the Wendy's defendants failed to adopt practices to curtail the number of firearms which ultimately ended up in the hands of criminals. (*See, e.g.,* Johnson Letter, dated April 2, 2004 at 5; *Smith* Compl. ¶ 58).

Plaintiff City of New York ("City") brings its action against the "manufacturers, importers and distributors of firearms [ (collectively, the 'City defendants') ] for common law and statutory public nuisance." *City of New York v. Beretta,* Order dated April 12, 2004, slip. op. at 6. The City alleges that "the imprudent policies and practices of [the City defendants] in manufacturing, marketing, distributing, and selling guns substantially increase levels of gun use, crime, deaths, and injuries in New York City." *Id.* Specifically, the City alleges that the City defendants increased the production of handguns that are popular with criminals and oversupplied guns to states with less restrictive gun laws knowing that these guns would be resold in states with stricter gun laws.

The Wendy's plaintiffs and the City (collectively, "plaintiffs") have served subpoenas on the BATF to compel BATF to produce certain data that BATF collects and compiles regarding the sale of firearms within the United States. The City, by subpoena dated April 19, 2004, seeks: (1) "firearms tracing system data ... previously produced by [BATF] under protective order in *National Association for the Advancement of Colored People v. Acusport, Inc.,* 210 F.R.D. 268 (E.D.N.Y.) [ ('*NAACP*') ],[2] updated to reflect data elements for the period from 1989 through the most currently available data[;]" (2) "firearms licensing system data previously produced by [BATF] under protective order in [*NAACP*], updated to reflect data elements for the period from 1989 through the most currently available data[;]" and (3) all data produced to plaintiff Smith. Plaintiff Smith, by subpoena dated April 15, 2004, seeks all firearms tracing system data previously produced in *NAACP,* current through December 31, 2000, as well as firearms li-

---

1. Defendants Bryco Arms and B.L. Jennings, Inc. have filed notices of pending bankruptcy proceedings. Only defendants AcuSport Corporation ("AcuSport") and Atlantic Gun & Tackle, Inc. ("Atlantic Gun") (collectively, the "Wendy's defendants") are actively defending the suits brought by the Wendy's plaintiffs and have appeared to argue these motions.

2. Plaintiffs originally moved before the District Court for an order modifying the Order of Protection dated September 18, 2002 entered in the

*NAACP* action to permit the use of data released in that case by the parties in this case. By Order dated April 13, 2004, the district court denied the plaintiffs' request "to open the NAACP data for use in other gun cases." (Order dated April 13, 2004, at 2). However, in that Order, the District Court specifically stated that "this ruling does not control the issue of what, if any, [BATF] data should be available in the instant or any other case." (*Id.*)

censing system data current through December 31, 2000. Plaintiff Johnson, by subpoena dated April 21, 2004, seeks: (1) "[a]ll [BATF] trace data, the full and unrestricted data relating to [Atlantic Gun and Acusport;]" (2) "[a]ll [BATF] data relating to [Atlantic Gun and Acusport] relating to multiple sales[;]" (3) "[a]ll [BATF] inspection records for [Atlantic Gun and Acusport;]" and (4) "[a]ll demands made by [BATF] to [Atlantic Gun] and [Acusport]," each for the period covering January 1, 1996 to December 31, 2003, "or the most current date for which data is available." [3]

The BATF has moved to quash plaintiffs' subpoenas, asserting that BATF is barred by a provision of the Consolidated Appropriations Act of 2004, Pub.L. No. 108–99, 118 Stat. 3 (2004), codified as amended at 28 U.S.C. § 530C, from disclosing the data at issue, and that such data is protected by the law enforcement privilege. Defendants support BATF's contentions. In addition, the Wendy's defendants argue that the BATF data requested by the Wendy's plaintiffs is irrelevant to their claims in these actions. However, defendants argue in the alternative that, if the Court orders any production of BATF data, the defendants are entitled to "full access to and an unfettered right to use" BATF data updated through December 31, 2003. (Manufacturer and Distributor Defendants' Submission in Response to April 5, 2004 Order, dated April 16, 2004 ("City Defs.' Mem."), at 4; *see also* Atlantic Gun Letter, dated April 16, 2004, at 4; AcuSport Letter, dated April 16, 2004, at 3). A hearing was held before this Court on April 23, 2004, and the parties have briefed these issues extensively.

### DISCUSSION

#### I. Relevance

The data requested by the plaintiffs in these actions is similar to that which was disclosed pursuant to a protective order in *NAACP*. *See National Association for the Advancement of Colored People v. Acusport Corp.,* 210 F.R.D. 268 (E.D.N.Y.2002) (adopting report of special master detailing the contents of BATF's databases and appending protective order). As described by the special master appointed by the court in *NAACP,* the data compiled by BATF consists of: (1) "trace information," or the sales histories of weapons that are the subject of law enforcement investigations; (2) "theft information," or thefts of weapons reported by federal firearms licensees ("FFLs") or others; (3) "multiple sales information," or records of multiple purchases of weapons by single, non-FFL purchasers; (4) "demand letter information," which consists of correspondence from BATF to FFLs demanding acquisition and disposition records from the FFL based on certain triggering criteria; (5) "BATF investigations" data, or data involving ongoing investigations of individuals and FFLs; (6) "Out of Business Records," or the records of FFLs that have ceased to do business; and (7) "federal firearm licensee" data, or general information regarding FFLs. *Id.* at 273–78.[4]

Plaintiffs argue that BATF data is necessary in order for plaintiffs to prove their negligence and nuisance claims against the defendants in these actions. Plaintiff Smith asserts that she "requires the firearm trace data ... in order to demonstrate that [Atlantic Gun and Acusport] have sold substantial numbers of crime guns over a consistent period of time." (Memorandum of Law on Behalf of Plaintiff Joan Truman Smith, dated April 2, 2004 ("Smith Mem."), at 4). Plaintiff Johnson asserts that the BATF data is necessary to show that "defendants were on notice of the fact that a crime being committed with one of their guns was clearly foreseeable." (Johnson Letter, dated April 2, 2004 at 4). Smith argues that since the Wendy's defendants have represented that they do not retain records regarding the number of guns

---

3. Although BATF has not addressed the specific requests made by the plaintiff in *Johnson,* it is not entirely clear to this Court what some of the requests are seeking. Accordingly, to the extent that BATF is also unclear, the parties are requested to confer in an effort to resolve any

disputes regarding the scope of the items requested in any of the subpoenas.

4. As is indicated by plaintiffs' subpoenas, not all of these databases are currently the subject of document requests in these actions.

they have sold that have been subsequently linked to crimes, the "BATF firearms trace data remains the only source of this information on the number of crime guns moving between the defendants." (Smith Mem. at 4). Although BATF routinely notifies gun distributors and retailers when their guns are traced to criminal activity, there is no requirement that manufacturers or retailers maintain such records. Thus, plaintiff Johnson asserts that it would be "inherently unfair and prejudicial" to deny plaintiffs access to BATF trace data since Atlantic Gun and Acusport routinely were notified by BATF when their guns were traced (Johnson Letter, dated April 22, 2004, at 2), and they "can request [that information] from [BATF] directly." (Johnson Letter, dated April 2, 2004 at 6).

In response, the Wendy's defendants argue that the *Smith* and *Johnson* cases each involve only one firearm, the sales history of which is known and undisputed by the parties. (*See* Atlantic Gun Letter, dated April 16, 2004 at 1). Therefore, Atlantic Gun argues that it is the circumstances of the marketing and distribution of this single firearm which will ultimately be dispositive, rather than "mere inferences and expert extrapolations drawn from unreliable ATF data and statistics." (*Id.* at 2). Relying on the New York Court of Appeals decision in *Hamilton v. Beretta U.S.A. Corp.*, 96 N.Y.2d 222, 727 N.Y.S.2d 7, 750 N.E.2d 1055 (2001), Atlantic Gun argues that the Court of Appeals "rejected plaintiff's arguments that the [BATF] trace data discloses any significant information from which to apportion liability to firearms sellers." (*Id.*)[5]

For purposes of discovery, information is relevant if it is "reasonably calculated to lead to the discovery of admissible evidence." Fed.R.Civ.P. 26(b)(1); *see also Martin v. Valley Nat'l Bank of Arizona*, No. 89 CV 8361, 1992 WL 196798, at *5 (S.D.N.Y. Aug. 6, 1992). In denying the Wendy's defendants' motion to dismiss plaintiff's public nuisance claim in *Johnson*, the District Court noted that:

Plaintiff states that the defendants' marketing, distribution and sales practices unreasonably interfere with the property, health, safety and comfort of the general public by facilitating the diversion of large numbers of firearms from the primary legal market to the illegal underground market.... Plaintiff contends that defendants continued to engage in these practices despite knowledge, through [BATF] crime-gun traces and other sources, that their firearms were disproportionately being diverted into the illegal market and that one of the guns moving through that illicit channel caused his injuries.

*Johnson v. Bryco Arms,* Order filed February 11, 2004, slip. op. at 21. In denying the Wendy's defendants' motion to dismiss plaintiff Johnson's negligence claim, the District Court noted that "[a]lthough the firearm [used in the Wendy's robbery] ... changed hands illegally a number of times ... it is alleged that the defendants were put on notice that this kind of transfer would forseeably occur. [Plaintiff] relies upon [BATF] data establishing that a high proportion of defendants' guns were the subject of crime-gun traces." *Id.* at 23. Finally, the Court distinguished the New York Court of Appeal's decision in *Hamilton*, stating that "three years [after *Hamilton*], significantly more evidence is available. In [*NAACP*], extensive discovery and detailed expert testimony based upon [BATF] data ... demonstrated that it could be concluded that the defendant gun companies had engaged in irresponsible marketing, distribution and sales practices...." *Id.* at 24.

The District Court's opinion in *Johnson* rejected the Wendy's defendants' assertion that the Wendy's cases will ultimately be determined solely by the facts and circumstances surrounding the sale of the individual firearm used in that robbery. Plaintiffs' public nuisance claim requires plaintiffs to prove, *inter alia*, that the defendants' "marketing and sales practice lead to the diversion of large numbers of firearms into the illegal secondary gun market." *Id.* at 7. In

---

5. AcuSport joins in the substance of these arguments. (*See* AcuSport Letter, dated April 16, 2004, at 1–2).

addition, plaintiffs' negligence claims in both *Smith* and *Johnson* will turn on "a showing that a specific class of manufacturers or dealers play a disproportionate role in supplying the criminal gun-trafficking market." *Id.* at 14. BATF data could be useful in making either of these showings. Therefore, plaintiffs' request for data in the possession of BATF is reasonably calculated to lead to the discovery of admissible evidence.

## II. *The Appropriations Act*

On January 23, 2004, Congress enacted the Consolidated Appropriations Act of 2004, Pub.L. No. 108–199, 118 Stat. 3 (2004), codified as amended at 28 U.S.C. § 530C ("2004 Act"). The 2004 Act provides that:

> *[N]o funds appropriated* under this or any other Act *may be used to disclose to the public* the contents or any portion thereof of any information required to be kept by licensees pursuant to section 923(g) of title 18, United States Code, or required to be reported pursuant to paragraphs (3) and (7) of section 923(g) of title 18, United States Code, except that this provision shall apply to any request for information made by any person or entity after January 1, 1998[.]

Pub.L. No. 108–199, 118 Stat. 3 (2004) (emphasis added). Section 923(g) of Title 18 requires licensed importers, manufacturers and dealers of firearms to maintain certain records regarding their acquisition and sale of firearms. 18 U.S.C. § 923(g)(1)(A). Specifically, Section 923(g)(3) requires FFLs to report multiple sales data to BATF. 18 U.S.C. § 923(G)(3)(A). Section 923(g)(7) requires FFLs to provide, upon request, sales trace data to BATF to assist in "bona fide criminal investigation[s]." 18 U.S.C. § 923(g)(7). The bulk of the data requested by plaintiffs in these actions is maintained pursuant to 18 U.S.C. § 923(g). (*See* Bureau of Alcohol, Tobacco, Firearms and Explosive's Memorandum of Law in Opposition to Subpoena and Informal Discovery Requests, dated April 21, 2004 ("BATF Mem."), at 10). BATF argues that the 2004 Act prohibits the disclosure to plaintiffs of any trace data, multiple sales records, or other "federal firearms licensing information required to be kept pursuant to [Section 923(g)]." (*Id.* at 13). BATF asserts that, even though the explicit language of the 2004 Act speaks only in terms of prohibiting the use of appropriated funds, what "Congress clearly intended" in enacting the 2004 Act was to prohibit "disclosure [of this data] during the course of discovery in a civil action." (*Id.*) [6]

In response, plaintiffs contend first that the plain language of the 2004 Act precludes its application to plaintiffs' discovery requests in these actions. Plaintiffs argue that the 2004 Act, by its terms, only affects "disclos[ures] *to the public*[,]" Pub.L. No. 108–199, 118 Stat. 3 (emphasis added), and that production of data in response to a subpoena served pursuant to Rule 45 by a party in a civil action does not constitute disclosure "to the public." (Plaintiff City of New York's Submission Regarding the ATF Databases, dated April 22, 2004 ("City Mem."), at 4). In addition, the Wendy's plaintiffs argue that, even if the 2004 Act does apply to the production of data in response to subpoenas, the 2004 Act "simply prohibits BATF from *expending funds* to provide data to the public; it does not prohibit all releases of [data]." (Smith Mem. at 6 (emphasis added)). Therefore, if the Court were to find that the language "disclose to the public" was intended to include information provided in the course of litigation, the Wendy's plaintiffs have offered to pay BATF for the costs of producing such data, in order to circumvent any prohibitions embodied in the 2004 Act. (Johnson Letter, dated April 22, 2004, at 3). Plaintiffs further argue that, if the 2004 Act were construed to prohibit such disclosures, that prohibition would not be sufficient to repeal by implication the judicial power embodied in Rule 45 of the Federal Rules of Civil Procedure to compel such disclosures. (Reply Memorandum of Law on Behalf of Plaintiff Joan Truman Smith ("Smith Reply Mem."), at 3–4). Finally, plaintiffs assert that any interpretation of the 2004 Act that limited the subpoena power of the court would "nec-

---

**6.** Defendants join in these contentions. (*See, e.g.,* City Defs.' Mem. at 3 (arguing that "[t]he plain language of the 2004 Rider precludes the disclo- sure of [BATF] data to the public, including the parties in this case")).

essarily involve a constitutionally impermissible encroachment on judicial power." (Smith Mem. at 8).

## A. Interpretation of the 2004 Act

"Our starting point in statutory interpretation is the statute's plain meaning, if it has one." *United States v. Dauray*, 215 F.3d 257, 260 (2d Cir.2000). In *Dauray*, the court held that since Congress had not defined the terms at issue, the court would "consider the ordinary, common-sense meaning of the words." *Id.* (consulting dictionary definition of terms at issue); *see also Perrin v. United States*, 444 U.S. 37, 42, 100 S.Ct. 311, 62 L.Ed.2d 199 (1979). In determining the "plain meaning" of statutory terms, a court should " 'consider not only the bare meaning of the word but also its placement and purpose in the statutory scheme. The meaning of statutory language, plain or not, depends on context.' " *United States v. Dauray*, 215 F.3d at 261 (quoting *Bailey v. United States*, 516 U.S. 137, 145, 116 S.Ct. 501, 133 L.Ed.2d 472 (1995)). "When the plain language [of a statute] ... fail[s] to resolve statutory ambiguity, [courts should] resort to legislative history" in order to determine Congressional intent. *Id.* at 264; *see also Lee v. Bankers Trust Co.*, 166 F.3d 540, 544 (2d Cir.1999) (holding that "[l]egislative history and other tools of interpretation may be relied upon only if the terms of the statute are ambiguous").

### 1. Plain Meaning

■ Here, Congress has provided no definition of the term "public" in the 2004 Act. *Webster's New World Dictionary* provides several definitions of the term "public," including "known by, or open to the knowledge of, all or most people." *Webster's New World Dictionary* 1087 (3d ed.1988). Plaintiffs argue that the discovery sought here does not fall within the commonly accepted meaning of disclosure "to the public." (*See* City Pls.' Mem. at 2 (contending that "[p]arties to a civil action, particularly when subject to court-ordered confidentiality, do not come within any common usage of the term 'the public' ")). Plaintiffs assert that courts, in construing statutes other than the one at issue here, have distinguished between disclosures in the course of judicial proceedings and disclosures to the public at large. (*Id.* at 7 (citing *Equal Employment Opportunity Comm'n v. Associated Dry Goods Corp.*, 449 U.S. 590, 101 S.Ct. 817, 66 L.Ed.2d 762 (1981))). Plaintiffs further argue that Congress itself has, on other occasions, explicitly prohibited disclosure of materials in the course of litigation. (*Id.* (citing 15 U.S.C. § 2055)). Therefore, plaintiffs argue that the language "to the public" in the 2004 Act plainly does not include a disclosure in response to a judicial subpoena subject to a confidentiality order.

BATF disagrees, asserting that disclosure of the data at issue, even if limited by a protective order to the parties' attorneys and experts, would "constitute a prohibited disclosure to the public." (Bureau of Alcohol, Tobacco, Firearms and Explosives' Supplemental Memorandum of Law dated April 30, 2004 ("BATF Supp. Mem."), at 4) (internal citations omitted). In the alternative, BATF argues that, even if this Court does not agree that disclosure to attorneys and experts subject to a confidentiality order would constitute a prohibited disclosure of the data, unlawful disclosures would inevitably occur during the course of the eventual trials of these actions. (*Id.* at 5–7). BATF asserts that, even with a protective order in place, the data requested here would be the subject of expert testimony and would be incorporated into trial exhibits, just as it was in the *NAACP* trial. (*Id.*) Once this information was in the trial record, BATF asserts that there would be no way to prevent its further disclosure by jurors and spectators. (*Id.* at 8–9).

Defendants agree with BATF's interpretation of the 2004 Act. Indeed, defendants argue "where an agency's interpretation brings the benefit of the agency's specialized experience to bear on the meaning of a statute, [this Court] should give a measure of deference to the agency's interpretation." (City Defs.' Supp. Mem. at 6 (citing *United States v. Mead Corp.*, 533 U.S. 218, 234–35, 121 S.Ct. 2164, 150 L.Ed.2d 292 (2001) (finding that a tariff classification ruling issued by the Customs Service deserves "a respect propor-

tional to its power to persuade") (internal citations omitted))); *see also Reno v. Koray,* 515 U.S. 50, 60–61, 115 S.Ct. 2021, 132 L.Ed.2d 46 (1995) (finding that published "internal agency guideline" is akin to interpretive rule and is therefore entitled to "some deference").

Defendants contend that the BATF has a "long-standing policy" of defining "public" in such a way as to exclude anyone other than the jurisdiction which submitted a specific trace request from obtaining information about a firearm which is the subject of or connected to an ongoing criminal investigation. (City Defs.' Supp. Mem. at 3–4). Defendants argue that, consistent with this definition, BATF's policy has been set out in its regulations, *see* 27 C.F.R. § 478.25, and in the public statements of BATF officials confirming that disclosure of information from the trace database to anyone other than authorized law enforcement agencies could result in administrative penalties. (City Defs.' Supp. Mem. at 4 (citing *NAACP* Trial Tr. at 3744–45)). Defendants contend that any interpretation of the term "public" in the 2004 Act must necessarily be guided by the agency's historical practices and policies, with deference being given to the agency's interpretation of legislation such as this which relates to its specialized mission and responsibility. (*Id.* at 6 citing *United States v. Mead Corp.,* 533 U.S. at 234, 121 S.Ct. 2164).

In *Equal Employment Opportunity Commission v. Associated Dry Goods Corp.,* 449 U.S. at 598, 101 S.Ct. 817, the Supreme Court held that a provision in Title VII of the Civil Rights Act of 1974 that prohibited the disclosure of information gathered in the course of an EEOC investigation to the "public" did not prohibit the disclosure of such information to the party who had initiated the complaint with the EEOC for use in a potential lawsuit. *See also Equal Employment Opportunity Comm'n v. Morgan Stanley & Co., Inc.,* 132 F.Supp.2d 146, 155–56 (S.D.N.Y.2000). However, in construing the use of the term "public" in Title VII, the Court was guided by the fact that another

provision of the same statute prohibited disclosure of the discrimination charges themselves to the "public." *See Equal Employment Opportunity Comm'n v. Associated Dry Goods Corp.,* 449 U.S. at 598, 101 S.Ct. 817; (*see also* City Defs.' Supp. Mem. at 7). The Court found that, since common sense dictated that the charge itself could not be concealed from the charging party, the term "public" should be construed both in that subsection and throughout the statute not to include the charging party. *See Equal Employment Opportunity Comm'n v. Associated Dry Goods Corp.,* 449 U.S. at 598, 101 S.Ct. 817.[7]

Plaintiffs note that Congress has, on other occasions, explicitly prohibited disclosure of certain types of information to civil litigants. (City Mem. at 7). Congress has stated unequivocally that certain consumer product safety reports "shall be immune from legal process and shall not be subject to subpoena or other discovery in any civil action in a State or Federal court or in any administrative proceeding . . . ." 15 U.S.C. § 2055(e)(2). Interestingly, in a separate provision of that same subsection, Congress prohibited government officials from "publicly disclos[ing]" the same consumer product safety reports. 15 U.S.C. § 2055(e)(1)(A). The language of Section 2055(e)(2) demonstrates that Congress can, and in fact has, specifically limited judicial subpoena power with regard to certain information in the possession of administrative agencies. *See also* 7 U.S.C. § 8401(e)(7)(B)(ii) ("[i]n a[n administrative] review . . . and in any [judicial] proceeding conducted pursuant to such review, neither the Secretary [of Agriculture] nor the Attorney General may be required to disclose to the public any information" protected from disclosure under FOIA). In fact, in Section 2055, Congress used language to clearly distinguish between disclosures to the public and discovery in a civil action.

Not only do these examples demonstrate that Congress is able to draft a statute specifically prohibiting the disclosure of information to parties in the context of litigation as

---

7. In addition, defendants note that the Court considered the EEOC's interpretation of the statute in arriving at its conclusion. (*See* City Defs.'

Supp. Mem. at 7); *Equal Employment Opportunity Comm'n v. Associated Dry Goods Corp.,* 449 U.S. at 596–597, 101 S.Ct. 817.

opposed to the "public" generally, but the 2004 Act does not even prohibit disclosure of the information. Instead, the 2004 Act prohibits the use, by the BATF, of appropriated funds in making the disclosure of information to the public. If Congress had intended to prevent all disclosures of such information, even in the context of a judicial subpoena subject to a protective order, it could have expressly indicated that intent in the statute.

BATF, relying on case law from within this circuit interpreting the False Claims Act, 31 U.S.C. § 3729 *et seq.*, argues that in the context of that statute, the Second Circuit has held that disclosure in the course of a judicial proceeding constitutes disclosure to the public. (BATF Supp. Mem. at 7). In *United States ex rel. Kreindler & Kreindler v. United Technologies Corp.*, 985 F.2d 1148, 1158 (2d Cir.1993), the court held that an action brought pursuant to the False Claims Act was barred by a provision of that statute that denied courts jurisdiction over actions "based upon the public disclosure" of allegations of wrongdoing. 31 U.S.C. § 3730(e)(4). The court found that discovery material that had been produced subject to a protective order in a previous action and then filed with the court in that action without seal had been publicly disclosed within the meaning of the False Claims Act. *See United States ex rel. Kreindler & Kreindler v. United Technologies Corp.*, 985 F.2d at 1157–58. *See also United States v. Nature's Farm Products, Inc.*, No. 00 CV 6593, 2004 WL 74310, at *4 (S.D.N.Y. Jan. 15, 2004) (holding that allegations in a complaint were publicly disclosed within the meaning of False Claims Act). Plaintiffs argue that these cases are inapposite because, in each instance, the information found to be disclosed to the public had been filed with the court "without [the] bene-

fit of a protective order." (City Supp. Mem. at 7).

Plaintiffs are correct that these cases are distinguishable. Here, if plaintiff's discovery requests were satisfied, the BATF data would be produced subject to a protective order similar to that governing the disclosure of BATF data in *NAACP*. Such an order would prohibit the dissemination of data to anyone other than attorneys, experts, or other specifically authorized recipients. Although BATF asserts that the data would end up in the public record of the proceedings in the form of expert testimony or trial exhibits, it is likely that such testimony or exhibits would primarily contain analyses and summaries of the data, rather than the underlying data itself. To the extent that testimony or exhibits did contain information directly related to law enforcement investigations, such testimony or exhibits could be sealed. A sealing order issued by the District Court prior to or during the course of trial would prevent the public from accessing such information. Indeed, a protective order could be drafted in such a way as to allow BATF an opportunity to lodge objections and seek court intervention prior to disclosure at trial of any raw data.[8]

Furthermore, this Court is not convinced by defendants' argument that this Court should defer to BATF's interpretation of the language in question. The cases cited by defendants for that proposition deal with the degree of deference accorded agency action akin to interpretive rulemaking. *See, e.g., Household Credit Servs., Inc. v. Pfennig,* —— U.S. ——, 124 S.Ct. 1741, 1748, 158 L.Ed.2d 450 (2004); *United States v. Mead Corp.*, 533 U.S. at 234–35, 121 S.Ct. 2164. Here, there is no published BATF rule or guideline that embodies BATF's interpretation of the language of the 2004 Act.[9] Instead, defendants

---

8. In its Supplemental Memorandum, BATF complains that much of the data will be publicly disclosed at trial in violation of the 2004 Act, citing certain examples of categories of information revealed in accordance with the *NAACP* protective order. There is nothing that prevents the parties from drafting a protective order which would deal with these concerns without sacrificing the parties' need for this information in presenting their cases. (*But see* BATF Supp. Mem. at 8–9).

9. While defendants cite to 27 C.F.R. § 478.25, that provision states only that "[u]pon the request of any Federal, State, or local law enforcement agency, the Director of Industry Operations may provide such agency any information contained in the records required to be maintained by the [Gun Control Act] or this part." 27 C.F.R. § 478.25. That provision merely states that BATF may disclose firearms data to law enforcement agencies. It does not prohibit BATF from disclosing any such data to other individuals, nor

are asking this Court to defer to the litigating position of BATF, rather than formal or informal rulemaking instituted by the agency.[10]

Plaintiffs further argue that an interpretation of the 2004 Act which prevented disclosure of firearms data pursuant to judicial subpoena would amount to an unconstitutional encroachment by Congress on the judicial authority. (*See* Smith Mem. at 7–10). Plaintiffs argue that the 2004 Act should be construed to avoid any potential constitutional defect. *See Communications Workers of America v. Beck*, 487 U.S. 735, 762, 108 S.Ct. 2641, 101 L.Ed.2d 634 (1988) (stating that "statutes are to be construed so as to avoid serious doubts as to their constitutionality[ ] and ... when faced with such doubts the [c]ourt will first determine whether it is fairly possible to interpret the statute in a manner that renders it constitutionally valid"). In *Universal Airline, Inc. v. Eastern Air Lines, Inc.*, 188 F.2d 993 (D.C.Cir.1951), cited by the plaintiffs, the court held that, despite a regulation promulgated by the Civil Aeronautics Board ("CAB") precluding expert testimony by CAB investigators in civil actions, a court could compel an expert's testimony if such testimony was "the sole source of evidence reasonably available to the parties." *Id.* at 1000. The court stated that "the function of the subpoena .... is a necessary and essential part of the 'judicial [p]ow-

er' vested by the Constitution." *Id.* at 999 (quoting U.S. Const., Art. III, § 1). Plaintiffs argue that *Universal Airline* stands for the proposition that the court's subpoena power is constitutionally enshrined, and thus any interpretation of the 2004 Act which would limit the subpoena power is constitutionally suspect.[11]

In response, BATF points out that the court in *Universal Airline* refused to compel the CAB to produce "reports, orders or private papers" relating to the accident in question which were also protected from disclosure by statute and agency regulation. *Universal Airline, Inc. v. Eastern Air Lines, Inc.*, 188 F.2d at 1000. Thus, BATF argues that a prohibition on disclosure of firearms data would not necessarily amount to an unconstitutional intrusion on the judicial subpoena power. (*See* BATF Mem. at 21–22).[12] Defendants further argue that Rule 45, by its terms, allows a court to quash a subpoena that demands "privileged or other protected matter." Fed.R.Civ.P. 45(c)(3)(A)(iii). (*See* City Defs.' Mem. at 13). In sum, defendants argue that plaintiffs' subpoenas should either be quashed as defective, or, in the alternative, any limitation on the subpoena power imposed by the 2004 Act is constitutional. Given this Court's analysis of the plain language of the 2004 Act and the context of the legislative history in which the provision was enacted, this

does it set restrictions on disclosures to law enforcement agencies themselves. Furthermore, this regulation was promulgated prior to the passage of the 2004 Act, and does not constitute an interpretation of that Act.

**10.** The parties have made various arguments regarding BATF's current and past practices regarding the disclosure of firearm data to various law enforcement agencies and members of the weapons industry. While these practices are arguably of some relevance in attempting to divine Congress' intent in enacting the 2004 Act, and in assessing the applicability of the law enforcement privilege, and thus will be examined for those purposes below, they are not relevant for the purpose of assessing BATF's interpretation of the 2004 Act. It is undisputed that BATF did not willingly provide firearms data in response to judicial subpoenas either before or after passage of the 2004 Act. Therefore, BATF's current practices are not equivalent to informal rulemaking performed in response to the 2004 Act. Thus, while BATF's practices may be relevant in as-

sessing the landscape against which Congress legislated in passing the 2004 Act, or in assessing the applicability of the law enforcement privilege, BATF's practices cannot be viewed as akin to an interpretive rule formulated in response to the 2004 Act.

**11.** Plaintiffs also cite *United States v. Klein*, 13 Wall. 128, 80 U.S. 128, 20 L.Ed. 519 (1871). In *Klein*, the court held that Congress could not, by statute, dictate factual findings in casing pending before the courts. *Id.* at 146. *Klein* is inapplicable here because the 2004 Act does not mandate particular findings in any of these pending actions. (*See* City Defs.' Supp. Mem. at 15–17).

**12.** *See also Chiron Corp. v. National Transportation Safety Board*, 198 F.3d 935, 941 (D.C.Cir. 1999) (finding that federal statute barred NTSB from producing agency report to potential civil litigant but noting that agency rule allowed for the disclosure of underlying facts found by investigators, thus preventing prejudice to petitioner).

Court need not resolve this constitutional question here. However, it should be noted than an interpretation of 2004 Act that allows for disclosure to the parties in these actions would avoid this constitutional question. *See Communications Workers of America v. Beck*, 487 U.S. at 762, 108 S.Ct. 2641.

In addition to their constitutional argument, plaintiffs assert that an interpretation of the 2004 Act that limits the subpoena power of the court should be avoided because such an interpretation would constitute a partial "implied repeal" of Rule 45.[13] (*See* Smith Reply Mem. at 4). In response, BATF and defendants argue that Congress can affect changes in substantive law through the passage of appropriations legislation. (*See* BATF Mem. at 18–20; City Defs.' Supp. Mem. at 11–12). In *Tennessee Valley Authority v. Hill*, 437 U.S. 153, 190, 98 S.Ct. 2279, 57 L.Ed.2d 117 (1978), the Court stated that "[t]he doctrine disfavoring repeals by implication .... applies with even greater force when the claimed repeal rests solely on an Appropriations Act." *See also Auburn Housing Auth. v. Martinez*, 277 F.3d 138, 145 (2d Cir.2002) (stating that "[w]hile Congress may amend or repeal a statute by means of an appropriations bill, its intention to do so must be clear"); *McHugh v. Rubin*,

220 F.3d 53, 57 (2d Cir.2000) (same). Here, plaintiffs urge that since no clear intention is evident, the 2004 Act should not be interpreted to effect an implied repeal of Rule 45.[14]

Through its action in other legislative contexts, Congress has demonstrated a willingness to explicitly prohibit the disclosure of information in the possession of administrative agencies to litigants in civil discovery. *See* 15 U.S.C. § 2055. Congress has not done so here. Based on the plain language of the 2004 Act, this Court is convinced that the production of data pursuant to a judicial subpoena and protected by a confidentiality order would not implicate the 2004 Act's prohibition on using appropriated funds to make public disclosure of the information at issue. However, this Court also recognizes that the provisions of the 2004 Act are not completely free of ambiguity. Therefore, this Court looks to the legislative history of the 2004 Act, as well as the facts and circumstances surrounding passage of the 2004 Act, in an attempt to further discern Congressional intent.

### 2. *Congressional Intent*

Prior to the enactment of the 2004 Act, Congress enacted the Consolidated Appro-

---

**13.** 28 U.S.C. § 2074 sets forth the procedure by which proposed rules of civil procedure are adopted by Congress. Proposed rules are submitted to Congress. Congress is given at least seven months to act to amend those rules. If no changes are made, the proposed rules become effective. *See* 28 U.S.C.A. § 2074, Commentary on 1988 Revision.

**14.** In addition, the City asserts that the Gun Control Act of 1968, 18 U.S.C. § 921 *et seq.*, provides distinct statutory authority for the disclosure of firearms data to the City. (City Supp. Mem. at 2–3, Ex. A). Specifically, the City cites the transmittal letter sent by BATF accompanying past disclosures of firearms data. (City Supp. Mem., Ex. A). The letter states: "This data is being forwarded pursuant to the provisions of the Gun Control Act of 1968. Section 101 of the Act states that the purpose of the Gun Control Act is to support Federal, State and local law enforcement officials in their fight against crime and violence." (*Id.*) The City also cites 27 C.F.R. § 478.25, which states that, "[u]pon the request of any Federal, State or local law enforcement agency, [BATF] may provide such agency any information contained in the records

required to be maintained by the [Gun Control Act] or this part." 27 C.F.R. § 478.25. The City argues that the Gun Control Act provides statutory authority for the disclosure of firearms data to municipalities, and that BATF has in fact acted pursuant to this authority in the past in disclosing certain types of firearms data to the City. (*Id.* at 2–3). BATF, however, maintains that the Gun Control Act merely permits, rather than requires, the agency to disclose certain limited types of firearms data to law enforcement agencies. (BATF Letter, dated May 5, 2004, at 2). The City responds that even if such authority is permissive, it still provides BATF with a distinct source of power to provide such data, unaffected by the terms of the 2004 Act. (City's Reply Mem. at 2–3). Thus, the City maintains that the 2004 Act should not be interpreted to limit that authority. Since this Court finds that the 2004 Act does not bar disclosure to any of the parties in the context of these cases, there is no need to rely on the provisions of the Gun Control Act in granting the City access to this information. However, should the District Court find that the 2004 Act bars disclosure to the Wendy's plaintiffs, the Gun Control Act arguably provides an alternative basis for disclosure to the City.

priations Resolution of 2003, Pub.L. No. 108–7, 117 Stat. 11 (2003) ("2003 Act"). This statute contained a similar provision to the one at issue in the 2004 Act. Division J, Title V, Section 644 of the 2003 Act provides:

No funds appropriated under this Act or any other Act with respect to any fiscal year shall be available to take any action based upon any provision of 5 U.S.C. 552 with respect to records collected or maintained pursuant to 18 U.S.C. 846(b), 923(g)(3) or 923(g)(7), or provided by Federal, State, local or foreign law enforcement agencies in connection with arson or explosives incidents or the tracing of a firearm, except that such records may continue to be disclosed to the extent and in the manner that records so collected, maintained or obtained have been disclosed under 5 U.S.C. 552 prior to the date of the enactment of this Act.

Pub.L. No. 108–7, 117 Stat. 11. The 2003 Act thus restricted the use of appropriated funds to disclose the same multiple sales and trace history data implicated by the 2004 Act. However, the 2003 Act is inapplicable here because it pertains only to disclosures made in response to requests submitted pursuant to the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552. Nonetheless, the legislative history surrounding the 2003 Act, as well as a comparison of its provisions to those of the 2004 Act, may be useful in discerning Congress' intent in enacting the 2004 Act.

In its report on the 2003 Act, the House Committee on Appropriations stated that the committee was:

concerned that certain law enforcement databases may be subject to public release under [FOIA]. As a result, information collected and maintained by [BATF] related to ongoing criminal investigations of firearms ... offenses could be released, potentially compromising those cases. What is a greater concern is that such release could be accomplished on a comprehensive basis, making all such data

available to the public. The need to maintain these databases on a limited confidential basis that has been in place at [BATF] for several years for tracing records derives from the long-term nature of criminal investigations. In addition to jeopardizing criminal investigations and officer safety, such information, once released, might easily be disseminated through the Internet. This would not only pose a risk to law enforcement and homeland security, but also to the privacy of innocent citizens.

H.R.Rep. No. 107–575, at 20 (2002). On the floor of the Senate, Senator Durbin criticized the 2003 Rider as a response by the gun industry to a FOIA request filed by the City of Chicago seeking firearms data maintained by BATF.[15] Senator Durbin stated that "[t]his provision sets a dangerous precedent because it essentially directs a Federal agency not to comply with [a] Federal court ruling, thus undermining the very purpose of FOIA. ... This is an effort by the gun industry to stop cities that are ravaged by gun crime from going after the irresponsible gun dealers who are selling guns to criminals." 149 Cong. Rec. S2,422 (Feb. 13, 2003).

Defendants argue that the intent of Congress in enacting the 2003 Act was clearly based on the concern that release of this information may "pose a risk to law enforcement and homeland security [and] to the privacy of innocent citizens." H.R.Rep. No. 107–575, at 20. Defendants further argue that the context in which this expression of Congressional intent was made, following the decisions of the courts in the *City of Chicago* and *NAACP* cases, must inform this Court as to the meaning of the word "public" as used in the 2004 Act. (City Defs.' Supp. Mem. at 5).

The relevant provisions of the 2004 Act were the subject of some debate on the floor of the Congress. Several Senators and Representatives made statements critical of the language in the bill prohibiting the disclosure

---

**15.** In *City of Chicago v. United States Dep't of the Treasury,* 287 F.3d 628 (7th Cir.2002), the Seventh Circuit ordered BATF to release multiple sales and trace history data to the City of Chicago. However, this opinion was vacated and remanded by the Supreme Court. *See* 537 U.S. 1229, 123 S.Ct. 1352, 154 L.Ed.2d 1097 (2003). In a single sentence, the Court ordered the Seventh Circuit to "consider what effect, if any" the 2003 Act had on that case. *Id.* This remand is now pending before the Seventh Circuit.

of firearms data to the public. Representative Conyers stated that the provisions which would "[p]rohibit [BATF] from releasing to the public information regarding sales and dispositions of firearms kept by gun dealers and manufacturers" would result in "[c]ommunity residents no longer [being] aware of neighbors stockpiling mass quantities of firearms." 149 Cong. Rec. H 12, 766, at H12,830 (Dec. 8, 2003). Representative McCarthy expressed concern that BATF "will not be allowed to release trace or multiple sales data, thereby ... effectively shielding the most corrupt firearm dealers from public scrutiny." 149 Cong. Rec. H12,766, at H12,841 (Dec. 8, 2003). Senator Reed lamented the fact that the legislation would "throw a cloak of silence over [laws mandating the collection of firearms data] ... and prevent any disclosure of information that should be public." 150 Cong. Rec. S66, at S71 (Jan. 21, 2004). Senator Reed went on to state that, "[a]s a result of publicly available information, there have been identified several firearms dealers who were the source of a preponderance of weapons at crime scenes. That is valuable information, not only to law enforcement authorities but to the general public, and that information should be public." *Id.*

Senator Mikulski stated that the 2004 Act "blocks the public from seeing critical information, even if they were the victim of a gun crime. If these rollbacks were in place last year, families of the DC sniper victims would not be allowed to know where the sniper got his gun and questionable practices of the gun shop. Without this information, they would be effectively denied their day in court." 150 Cong. Rec. S66, at S103 (Jan. 21, 2004). This statement by Senator Mikulski is the only statement in the legislative history of the 2004 Act that implies that its terms could prohibit production of firearms data to civil litigants. As set forth above, the other statements by legislators criticize the effect of the 2004 Act on disclosures to the "general public." *See, e.g.,* 150 Cong. Rec. S66, at S71 (statement of Sen. Reed).

Senator Mikulski's statement should not be considered to be conclusive evidence that, in enacting the 2004 Act, Congress intended to prohibit disclosure of firearms data pursuant to judicial subpoena. In fact, in making the statement excerpted above, Senator Mikulski was in the midst of criticizing a number of provisions of the omnibus appropriations bill pertaining to several agencies. Senator Mikulski did not explicitly mention the 2004 Act's prohibition on disclosure to the "public." Instead, he referred to a portion of the bill that allowed for the destruction of certain records relating to firearm purchases that had previously been retained for 90 days. *See* 150 Cong. Rec. S66, at S103. Therefore, it is unclear if Senator Mikulski was even referring to the portion of the 2004 Act at issue here that prohibits the disclosure of trace and multiple sales data to the "public."

Furthermore, based on a review of the legislative record, this Court is not convinced that there was any Congressional consensus that the 2004 Act would prohibit disclosures of firearm data pursuant to judicial subpoena. In fact, most legislators who commented on this provision of the bill referred to its effect on the public at large. For example, Senator Reed, in criticizing the effect of the 2004 Act, stated that the data at issue is "valuable information, not only to law enforcement authorities but to the *general* public, and that information should be public." 150 Cong. Rec. S66, at S71 (Jan. 21, 2004) (emphasis added). However, at the hearing held before this Court on these motions, defendants questioned what, if any, were the differences between the 2003 and 2004 Acts, or what purpose would be served by passage of the 2004 Act if the 2004 Act was not intended to prohibit disclosures pursuant to judicial subpoena. Since the 2003 Act restricted FOIA disclosure, and the 2004 Act refers to disclosures to the "public," defendants argued that some non-FOIA disclosures must be implicated in order to give effect to the terms of the 2004 Act.

At the hearing, the parties discussed BATF's current and past practices regarding the use and disclosure of firearms data. In addition, the parties have addressed this issue in their papers. Indeed, although BATF and defendants argue that the only other disclosures that Congress could have intended to affect by the 2004 Act are disclosures such as those sought here, at the hearing, the

City represented that BATF regularly provides firearms data to state and local law enforcement agencies, including the New York City Police Department ("NYPD"), upon request. (*See* City Supp. Mem. at 2; Smith Letter, dated April 30, 2004, at 1–2). As BATF explained, it currently discloses certain firearms data to law enforcement agencies when that data is requested by the agency itself. (Transcript of Proceedings on April 23, 2004 ("Hearing Tr."), at 55–56). However, BATF will only provide state and local law enforcement agencies with data pertaining to firearms recovered within their respective jurisdictions. (*Id.* at 56). For example, BATF will provide the NYPD with data regarding weapons recovered in New York City, but will not provide national data, or data regarding guns recovered in Los Angeles to the NYPD. (*Id.*) Indeed, in a declaration by Dorothy Chambers, dated December 7, 2000 ("Chambers Dec."), submitted by BATF in this action, Ms. Chambers describes BATF's past practice of disclosing certain data to law enforcement agencies. (*See* Chambers Dec. ¶ 6).

In addition to disclosures to law enforcement, plaintiffs assert that BATF has provided certain firearms data to manufacturers and distributors. (Smith Letter, dated April 30, 2004, at 2 (citing testimony of Gerald Nunziato at *NAACP* trial)). However, BATF contends that Mr. Nunziato was not responsible for BATF's disclosure policies and in fact attests to certain types of disclosures that were not authorized by BATF policy. (*See* Chambers Dec. ¶¶ 5–6, 10).

BATF's own supplemental submission, dated May 5, 2004, describes other public disclosures of firearms data endorsed by BATF. BATF asserts that 18 U.S.C. § 923(g)(1)(D) and its corresponding regulation, 27 C.F.R. § 478.25, permit BATF to make publicly available certain information relating to the identification of " 'prohibited persons' " who have purchased or received firearms. (BATF Letter, dated May 5, 2004, at 3). Similarly, BATF concedes that it previously provided to gun manufacturers certain information that BATF did not consider to be "sensitive law enforcement information," such as "the serial number, make and caliber of guns involved in law enforcement investigations." (*Id.* at 2). Both of these categories of information are examples of information previously made "publicly" available by BATF.[16] Presumably now, under the 2004 Act, BATF will no longer be permitted to use appropriated funds to make such disclosures because the provision of such information would amount to disclosures to the public.[17] Nowhere in the 2004 Act does Congress limit its effect to data containing "sensitive law enforcement information" nor is there any indication in the legislative history that Congress agreed with or even recognized the distinctions that the BATF has drawn with respect to the categories of information that could or could not be disclosed.

Plaintiffs argue that it would "strain [BATF's] interpretation to the point of absurdity" to assert that 2004 Act should be construed in conformity with BATF's past practices and thus to prohibit disclosure of national firearms data to municipalities on the one hand, but allow for the use of these funds to provide firearms data regarding weapons recovered within the municipality itself. (Smith Letter, dated April 30, 2004 at 1). Indeed, the legislative record does not contain any reference to or discussion of the specific non-FOIA disclosure practices of the BATF, nor is there any indication that the legislation was enacted with BATF's existing practices in mind.[18]

This Court is convinced that the weight of the legislative record indicates that Congress

---

**16.** Even defendants concede that they fall within the category of the "public" when discussing disclosure of such information. (*See* City Defs.' Supp. Mem. at 8–11).

**17.** Indeed, the City suggests that it is possible that Congress meant to limit these non-FOIA disclosures by prohibiting disclosures to the "public" in the 2004 Act. (City Mem. at 8).

**18.** Although the exemption in the 2003 Act which states that "such records may continue to be disclosed to the extent and in the manner that records so collected, maintained or obtained have been disclosed under 5 U.S.C. 552 prior to the date of the enactment of this Act[,]" Pub.L. No. 108–7, 117 Stat. 11, may in fact refer to BATF's past practices regarding these types of disclosures, similar language does not appear in the 2004 Act.

did not intend to restrict civil litigants from receiving firearms data pursuant to a judicial subpoena and subject to a confidentiality order. This class of recipients is far removed from the general public as was discussed in the Congressional debates. Furthermore, it is undisputed that certain disclosures of at least some of the data implicated by the 2004 Act are, and have been, regularly provided by BATF to municipalities and law enforcement agencies, and others, including the gun manufacturers and distributors, may also have received limited information as well. Thus, there are categories of recipients distinct from those requesting the data pursuant to FOIA, and from civil litigants, whom Congress could well have meant to include within the definition of "public" as that term is employed in the 2004 Act. In fact, the 2004 Act need not have referred to any category of recipient to whom BATF regularly provides firearms data. Indeed, Congress may have been concerned with less controlled disclosures, such as published reports, which would effectively disclose firearms data to the general public. (*See* Smith Letter dated April 30, 2004, Ex. 1 (citing a BATF press release referring to the release of BATF's "first comprehensive report that presents data on the firearms industry")).

Therefore, this Court concludes that the plain meaning of the 2004 Act, as well as the discernible Congressional intent in enacting that legislation, supports a finding that the 2004 Act does not apply to the disclosure of firearms data to civil litigants pursuant to subpoena, when that data will remain subject to a confidentiality order.[19]

### III. Law Enforcement Privilege

[3] BATF asserts that the data requested by plaintiffs is protected by the law enforcement privilege. BATF asserts that there exists a "common law privilege which exempts information from discovery if disclosure would interfere with law enforcement proceedings, or would compromise the privacy and confidentiality of persons who provide information to law enforcement agencies." (BATF Mem. at 25 (citing *Department of Investigation of the City of New York v. Myerson*, 856 F.2d 481, 483–484 (2d Cir. 1988))). In *Department of Investigation of the City of New York v. Myerson*, the court stated that:

---

**19.** Even if the 2004 Act did apply to disclosures pursuant to judicial subpoena and subject to a confidentiality order, the Act, by its clear terms, would only limit BATF's power to expend appropriated funds to disclose firearms data. *See* Pub.L. No. 108–199, 118 Stat. 3 ("*[N]o funds appropriated under this or any other Act* may be used to disclose to the public . . . .") (emphasis added). Therefore, if the expense of the data production was borne by plaintiffs, the terms of the 2004 Act would not be implicated. However, BATF argues that, despite the clear language of the 2004 Act, BATF is precluded from accepting reimbursement for the cost of production because the agency is precluded from using non-appropriated funds for any purpose. (BATF Mem. at 16–17). BATF argues that the agency is *required by statute to deposit any funds received* by the agency in the Treasury, and that no money can be withdrawn from the Treasury except by Act of Congress. (*Id.* (citing *Office of Personnel Management v. Richmond*, 496 U.S. 414, 424–25, 110 S.Ct. 2465, 110 L.Ed.2d 387 (1990) (finding that claimant was not entitled to disability payments not authorized by statute because such payments would amount to a disbursement from the Treasury not authorized by a Congressional appropriation))). However, none of the cases cited by BATF involve a cost-shifting mechanism imposed by a court during an ongoing litigation. Indeed, courts often award costs to the govern-

ment as a result of a discovery sanction, *see, e.g., Horsley v. United States*, No. 83 CV 0102, 1985 WL 2655, at *6 (N.D.Cal. June 5, 1985), or as reimbursement for the costs of producing documents in criminal cases. *See, e.g., Premises Known as 225, 1468 and 1470 Statler Towers v. United States*, 787 F.2d 796, 798 (2d Cir.1986). Moreover, as plaintiffs argue, any necessary expenditures by the government in producing the data at issue here could come from Justice Department funds appropriated for general litigation activities. (Smith Reply Mem. at 6–7). In *Cal–Almond, Inc. v. United States Dep't of Agriculture*, 960 F.2d 105 (9th Cir.1992), the court held that, despite a provision in an appropriations bill prohibiting the Department of Agriculture from expending appropriated funds to release certain documents, a party was entitled to receive the documents pursuant to a FOIA request since that party "offered to pay for a copy of the [document] or to copy the [document] using its own copy machine and an [electrical] generator." *Id.* at 106. The court stated that "if Congress intended to prohibit the release of the [document] under FOIA—as opposed to the expenditure of funds in releasing the [document]—it could easily have said so." *Id.* at 108. Here, even if the 2004 Act did apply, its prohibition could be avoided by the imposition of a cost shifting mechanism.

The purpose of [the law enforcement] privilege is to prevent disclosure of law enforcement techniques and procedures, to preserve the confidentiality of sources, to protect witness and law enforcement personnel, to safeguard the privacy of individuals involved in an investigation, and otherwise to prevent interference with an investigation.

*Id.* at 484. "When the government invokes the law enforcement privilege, the court must balance the public interest in nondisclosure against the need of the particular litigant for access to the privileged information." *Raphael v. Aetna Casualty & Surety Co.*, 744 F.Supp. 71, 74–75 (S.D.N.Y.1990). Thus, the law enforcement privilege is a qualified, rather than absolute, privilege. *See id.* at 74. However, the party asserting the privilege must "make a threshold showing that the privilege attaches" before the court is required to balance the parties' interests. *United States v. United States Currency in the Sum of Twenty One Thousand Nine Hundred Dollars*, No. 98 CV 6168, 1999 WL 993721, at *3 (E.D.N.Y. Sept. 21, 1999).

Here, BATF asserts that the firearms data is subject to the law enforcement privilege for anywhere between one year and an indefinite period of time, depending on the precise data elements requested. (BATF Mem. at 28).[20] BATF claims that disclosure of the firearms data would jeopardize ongoing law enforcement investigations. BATF argues that " 'a law enforcement investigation could be compromised if the news media or anyone other than the investigating law enforcement agency prematurely obtained trace data.' " (BATF Supp. Mem. at 14 (quoting Declaration of David L. Benton, dated Nov. 9, 2000 ("Benton Dec.") ¶ 36)). · BATF further asserts that, if a trace was leaked to a firearms dealer, that dealer could become aware of ongoing investigations targeting that dealer. (BATF Supp. Mem. at 15). In addition, premature disclosure of the location at which a firearm was recovered could tip off individu-

als involved in the underlying crime. (*Id.* at 16). BATF quotes a letter by Raymond W. Kelly, New York City Police Commissioner, to Attorney General John Ashcroft as stating that " 'release of trace information ... seriously jeopardizes the lives of law enforcement officers, informants, witnesses and others.' " (BATF Supp. Mem. at 13 (quoting Kelly Letter, dated August 19, 2002)). Finally, BATF asserts that the court in *NAACP* specifically found that firearms data maintained by BATF was protected by the law enforcement privilege. (BATF Supp. Mem. at 12 (citing *NAACP v. Acusport*, 210 F.R.D. at 430)).

Plaintiffs respond by arguing that the only court to fully consider the applicability of the law enforcement privilege to the BATF's firearms data rejected its application. (City Mem. at 9 (citing *City of Chicago v. United States Dep't of the Treasury*, 287 F.3d at 634)). Plaintiffs further argue that the imposition of a protective order would negate the conditions underlying the application of the law enforcement privilege. (City's Memorandum dated May 7, 2004, at 4). This Court agrees with the latter contention.

The concerns detailed by the BATF and summarized above are wholly inapplicable to the production of the data at issue pursuant to a protective order. Such an order, modeled after that imposed in *NAACP*, would prevent any harm to ongoing or future law enforcement investigations. Indeed, such data was produced in *NAACP* subject to a confidentiality order and BATF does not claim that the production therein resulted in any harm to law enforcement. (*See* Smith Reply Mem. at 8). Production to plaintiffs' counsel and experts would create no risk that criminal suspects or FFLs targeted by law enforcement would become privy to the BATF data. In addition, the use of firearms data at trial will most likely consist primarily of analyses and summaries rather than the identification of specific weapons, FFLs, or purchasers. Such analyses would be of no

---

**20.** In addition, BATF asserts that this privilege has been codified by regulation as it pertains to data maintained by the agency. *See* 27 C.F.R. § 70.803(e)(5)(iv) (prohibiting "[t]he disclosure of investigative records compiled for law enforcement purposes if enforcement proceedings would

thereby be impeded, or of investigative techniques and procedures whose effectiveness would thereby be impaired, unless the appropriate [BATF] officer determines that the administration of justice requires disclosure").

use to the wayward firearms dealer or violent criminal hoping to avoid prosecution. Any testimony or exhibits introduced at trial which does reference specific firearms, purchasers, or FFLs could be sealed by the District Court. Finally, while the District Court in *NAACP* did recognize, in the language of the protective order entered in that case, that the release of firearms data could jeopardize law enforcement activity, it did so in the context of releasing that data subject to a protective order, rather than in ordering it withheld. *See NAACP v. Acusport,* 210 F.R.D. at 430. Therefore, this Court finds that BATF firearms data produced pursuant to a confidentiality order is not protected by the law enforcement privilege.

## IV. *Scope of Data Production*

Plaintiff Smith seeks firearms trace and licensing data for the period 1989 through December 31, 2000. (Smith Subpoena, dated April 16, 2004). Plaintiff Johnson requests trace and multiple sales data from 1996 through December 31, 2003, over two years after the Wendy's shootings. (Johnson Subpoena, dated April 21, 2004).[21] The City and the defendants in all three actions seek that data which was previously produced in *NAACP,* updated through December 31, 2003.[22] (City's Letter, dated April 5, 2004 (seeking data "up to January 2004"); City Defs.' Mem. at 8; AcuSport Letter, dated April 16, 2004, at 3; Atlantic Gun Letter, dated April 16, 2004, at 4).

In addition, AcuSport argues that it needs access to all data fields, including those excluded from release in the *NAACP* case, and including law enforcement notes that may demonstrate that a particular gun was not a "crime" gun. (AcuSport Letter, dated April 16, 2004, at 4). Atlantic Gun and the City defendants join in this request. (Atlantic Gun Letter, dated April 16, 2004, at 4; City Defs.' Mem. at 7). AcuSport further argues that it requires firearms data updated through December 31, 2003 to "demonstrate ... the fragility of plaintiff's experts' statisti-

cal analyses and conclusions." (*Id.*) AcuSport, without further explanation, argues that changes in the nature, frequency and "results" of BATF inspection and enforcement programs "may have profound effects on the statistical analyses." (*Id.*) Similarly, Atlantic Gun argues that updated data is necessary because "plaintiffs' experts statistical results change when certain years worth of data is used as opposed to other years." (Atlantic Gun Letter, dated April 16, 2004, at 4). Atlantic Gun argues that it requires "[n]ew" rather than "outdated" data because "the number of traces for any given retail dealer ... changes over time." (*Id.* at 4–5).

The City defendants argue that the BATF data disclosed in the *NAACP* action is inadequate for the defense of the City's claims because the City has requested injunctive relief. Given this claim, the City defendants argue that updated data is necessary to reflect changes in the industry and in inspection procedures. (City Defs.' Mem. at 8–11). The City defendants argue that, without updated data, they will be "deprive[d] ... of the right to meaningfully defend themselves against injunctions potentially affecting defendants' future conduct and business operations." (*Id.* at 11).

According to the Declaration of David L. Benton, Deputy Director of the BATF, dated July 8, 2002 ("Benton Dec."), there are three categories of information contained in the firearms trace database for which BATF claims privilege: (1) all data compiled in a calendar year for a one-year period; (2) information as to the identity of the law enforcement agency requesting the trace and its investigative notes; the date of purchase of the traced firearm and its recovery location; serial numbers of traced weapons involved in a multiple sale; and the identity of FFLs involved in the trace, all for a five year period; and (3) the names and addresses of all individuals, indefinitely "to protect their privacy interests." (Benton Dec. ¶ 30). For the multiple sales database, BATF claims

---

21. Johnson also requests BATF inspection records for AcuSport and Atlantic Gun as well as all "demands" made by BATF to the Wendy's defendants for this period. (Johnson Subpoena, dated April 21, 2004).

22. The data produced in the *NAACP* covers the period from 1995 through 2000. *See NAACP v. Acusport,* 210 F.R.D. at 269, 430.

privilege for: (1) all data for a period of two years in order to allow BATF to discern patterns and trends; and (2) the names and addresses of individuals for an indefinite period to protect privacy interests. (*Id.* ¶ 31).

BATF contends that there has been no showing by the parties to support certain of their requests. BATF argues that plaintiffs do not need information regarding individual retail purchasers, possessors or associates to establish their claims, nor do they require information regarding the law enforcement agencies that have initiated trace requests. Similarly, BATF argues that since there is only one manufacturer and distributor involved in the Wendy's cases, there is no need to disclose a nationwide database relating to other manufacturers and distributors. (BATF Mem. at 31–32).

BATF contends that insofar as the Wendy's plaintiffs are concerned, BATF previously made certain information publicly available through FOIA, including the serial number, manufacturer and model of the traced firearm. With this information, BATF asserts that the Wendy's plaintiffs may obtain trace data from Acusport and Atlantic Gun by asking them to match this publicly available information with records which defendants are required to maintain pursuant to the Gun Control Act, 18 U.S.C. § 923(g). BATF also contends that plaintiffs will not be prejudiced if no access is given because the protective order in the *NAACP* case does not limit the use of the statistics and analyses introduced during the *NAACP* trial. (BATF Mem. at 31–34). To the extent that defendant Atlantic Gun was not a party to the *NAACP* litigation and therefore has never had access to the confidential data produced in that case, BATF argues that their counsel here represented others in the *NAACP* action and will "presumably" retain experts who had access to the data. (BATF Mem. at 35). BATF argues that the City may also use the information previously disclosed publicly through FOIA or disclosed during the *NAACP* trial and can therefore obtain sufficient information to satisfy its needs in this case. (BATF Mem. at 35).

This Court has already found that nationwide data is relevant to each of the plaintiff's claims. This Court is unconvinced that either the analyses utilized in the *NAACP* trial, or public information paired with the individual defendants' records, will satisfy plaintiffs' needs. Thus, this Court finds that the Wendy's plaintiffs are entitled to that data which was produced in the *NAACP* action. This data covers the period between 1995 and 2000. This data will be provided to the Wendy's defendants as well. Neither the Wendy's plaintiffs nor the Wendy's defendants have sufficiently shown why more recent data is necessary to prove or defend their claims. The Wendy's shooting occurred in May, 2000. Therefore, firearms data from 2001 to the present would not be relevant to the Wendy's defendants' practices prior to the date of the incident.

However, the City and the City defendants are entitled to data covering the period from 1995 through 2003. The production of this more recent data in the City action is necessitated by the City's claim for injunctive relief. Based on the arguments submitted thus far, the Court denies all requests for data older than that which was produced in the *NAACP* action, and for additional data elements not produced in the *NAACP* action. However, the parties are free to submit additional evidence and argument regarding the need for older data, or in the Wendy's cases, more recent data, or for additional data elements beyond those previously provided in the *NAACP* action.

Finally, the plaintiff in the *Smith* action has recently submitted an additional subpoena directed to BATF which seeks the following information: (1) "copies of inspection reports; investigation reports; notes by BATF agents ... federal firearms license applications ... [and] documents regarding any suspension or revocation of license ..." for AcuSport and Atlantic Gun; (2) complete files concerning the investigation and prosecution of Bernard Gardier and Jamal Gales; and (3) files relating to the investigation of the Bryco Jennings Model J38 .380 caliber pistol bearing serial number 1032592.

This Court has signed the subpoena and is returning it to plaintiff for service with this Order. However, to the extent that BATF seeks to quash this subpoena, the Court di-

rects that any such motion be filed expeditiously so that any issues relating to the information requested in this subpoena that would impact on the negotiation of a suitable protective order can be resolved as soon as possible.[23]

## V.  Conclusion

For the reasons set forth above, this Court finds that the firearms data maintained by BATF is relevant to plaintiffs' claims, is not prohibited from disclosure by the terms of the 2004 Act, and is not protected by any law enforcement privilege when produced subject to an order of confidentiality.

**SO ORDERED.**

23.  In addition, the subpoena issued by the plaintiff in the *Johnson* action, dated April 21, 2004, seeks BATF inspection records and "demand" records relating to AcuSport and Atlantic Gun. If