IN THE COURT OF APPEALS OF TENNESSEE
AT JACKSON
January 17, 2006 Session

## RICHARD SCHNEIDER, TAJUANA CHESHIER, JAMIE PAGE, and THE GANNETT SATELLITE INFORMATION NETWORK, d/b/a THE JACKSON SUN v. THE CITY OF JACKSON

**A Rule 3 Appeal from the Chancery Court for Madison County**
**No. 62846      James F. Butler, Chancellor**

---

**No. W2005-01234-COA-R3-CV - Filed June 14, 2006**

---

This case involves the Tennessee Public Records Act. The plaintiff newspaper sought access to investigative records generated by local law enforcement during the course of criminal investigations. The newspaper also sought financial documents relating to a license agreement between the municipal government and a private baseball franchise. The municipal government refused to disclose the criminal investigative records and failed to respond to the newspaper's written requests for the baseball franchise documents. The newspaper filed suit against the municipal government in the Madison County Chancery Court. After a show-cause hearing, the trial court ruled that the Public Records Act required the disclosure of both types of documents, and awarded the newspaper attorney's fees. The municipal government appeals. As to the criminal investigative records, we recognize the common-law law enforcement privilege, and on that basis we vacate the judgment of the trial court, reverse the award of attorney's fees, and remand for further proceedings. Regarding the baseball franchise documents, we find that, insofar as the documents were not in the possession of the municipal government at the time of the newspaper's requests, they were not subject to the Public Records Act at that time, and on that basis we vacate the trial court's award of attorney's fees and remand for further proceedings.

**Tenn. R. App. P. 3; Judgment of the Chancery Court is Vacated in part, Reversed in part, and Remanded**

HOLLY M. KIRBY, J., delivered the opinion of the Court, in which W. FRANK CRAWFORD, P.J., W.S., and ALAN E. HIGHERS, J., joined.

Lewis L. Cobb, Jackson, Tennessee, and Sara E. Barnett, Jackson, Tennessee, for defendant/appellant City of Jackson.

Charles M. Purcell, Jackson, Tennessee, and Matt S. Shepherd, Jackson, Tennessee, for plaintiff/appellees Richard Schneider, Tajuana Cheshier, Jamie Page, and the Gannett Satellite Information Network.

## OPINION

This appeal is the result of several unsuccessful attempts by a Jackson, Tennessee newspaper, Plaintiff/Appellee, *The Jackson Sun*, to gain access to two types of documents from the Defendant/Appellant, City of Jackson, Tennessee ("City"). The first category of documents to which *The Jackson Sun* sought access are police "field interview" cards. The field interview cards are generated by police officers, on patrol, while the officers interview suspects, witnesses, and informants. Each card is small, but contains a substantial amount of information. For example, the cards contain a date, time, and reason for the investigative stop, the investigating officer's name and number, the suspect's name, address, phone number, date of birth, race, sex, height, weight, driver's license number, social security number, eye color, hair color, the location of the interview, the interviewee's clothing description, the interviewee's vehicle year, make, model, license number, license type, license year, license state, and vehicle color. The cards frequently include a photograph of the subject.

The second category of documents to which *The Jackson Sun* sought access are financial documents relating to the operation of a professional baseball team. In November 2004, the City entered into a Stadium License and Use Agreement ("Agreement") with Lozinak Baseball Properties, LLC ("Lozinak Baseball"). Under the agreement, Lozinak Baseball agreed to operate a class "AA" minor league baseball team, the West Tennessee Diamond Jaxx, in a stadium owned by the City. The Agreement addressed the financial documents related to Lozinak Baseball's operation of the Diamond Jaxx:

> N. <u>Books, Records, and Accountings</u>. . . . The City shall have the right to make inspections of the books and records of [Lozinak Baseball] from time to time for purposes of verifying the accuracy of the accounting procedures and revenues to be derived by the City from the Stadium. The City's right of inspection shall be subject to its agreement to (i) refrain from making copies of any of [Lozinak Baseball's] records except as permitted by [Lozinak Baseball], such permission not to be unreasonably withheld, delayed or conditioned and (ii) hold all information obtained as a result of such inspection confidential and to not disseminate any such information to any third party without [Lozinak Baseball's] approval except as otherwise required under the Tennessee Open Records Law.

Thus, under the Agreement, the financial records regarding the Diamond Jaxx were to be generated by Lozinak Baseball and maintained in the possession of Lozinak Baseball. The City had the right to inspect the records and, with the permission of Lozinak Baseball, make copies of the records.

The Agreement also included termination procedures. The Agreement provided that if Lozinak Baseball and the Diamond Jaxx suffered operating losses in excess of $150,000 per year for two successive years, then Lozinak Baseball had the right to terminate the Agreement, provided Lozinak Baseball gave the City notice of the termination and documentation of the losses. Upon

receiving notice of termination, the City then had forty-five days in which to exercise an option to purchase the team and the franchise.

The requests for access to the two categories of documents by *The Jackson Sun* were made pursuant to the Tennessee Public Records Act, Tennessee Code Annotated section 10-7-503(a), which provides:

> **10-7-503. Records, open to public inspection – Exceptions. --**
> (a) Except as provided in § 10-5-504(f), all state, county and municipal records and all records maintained by the Tennessee performing arts center management corporation, except any public documents authorized to be destroyed by the county public records commission in accordance with § 10-7-404, shall at all times, during business hours, be open for personal inspection by any citizen of Tennessee, and those in charge of such records shall not refuse such right of inspection to any citizen, unless otherwise provided by state law.

T.C.A. § 10-7-503(a)(2005 Supp.). As to both categories of documents requested, *The Jackson Sun* submitted a written request to the City. None of the documents in either category were produced when the request was made. We first recount the facts and the ensuing legal proceedings, and then analyze each category of documents under the Tennessee Public Records Act.

## I. FACTS & PROCEDURAL HISTORY

On July 30, 2004, Plaintiff/Appellee Tajuana Cheshier, a reporter for *The Jackson Sun*, submitted a written request to the City's police department for access to photographs taken during routine police investigatory business. In pertinent part, Cheshier's letter requested "access to photos taken since January 2004 of pedestrians and motorists in which officers applied the practice of 'reasonable suspicion' in order to photograph them, although they were not arrested for a crime." The letter specified that Cheshier sought the documents pursuant to the Tennessee Public Records Act. The City declined to honor Cheshier's request.[1]

On October 26, 2004, the legal counsel for *The Jackson Sun* sent the City a second written request, seeking access to "all photographic or digital images and/or copies of any documents in the possession of the City of Jackson . . . of any and all persons photographed or interviewed by the Jackson Police officers as part of all 'field interviews.'" The request from *The Jackson Sun's* attorney explained that *The Jackson Sun* had reason to believe that City police officers had conducted 369 field interviews in 2004, that the officers generated field interview cards based on information obtained during those field interviews, that some cards were complete with photographs, and that no arrests or charges were levied against any of the individuals interviewed.

---

[1]At trial, the parties stipulated that the City was in possession of the photographs, that the requests for the records were received by the City, and that these records were made or received in connection with the transaction of official business.

The October 26, 2004 letter to the City from counsel for *The Jackson Sun* also requested information relating to the West Tennessee Diamond Jaxx professional baseball team. The letter requested, "Should the owners of the Diamond Jaxx provide the City with any 'notices of relocation,' . . . the City provide to *The* [*Jackson*] *Sun* copies of the notices, along with any related documents."

In response to the October 26, 2004 letter, the City again declined to produce or disclose the police field interview cards. The City did not respond to the request for documents relating to the Diamond Jaxx.

On December 14, 2004, Plaintiff/Appellee Jamie Page, another reporter from *The Jackson Sun*, sent a letter to the City's Mayor, Charles Farmer, requesting access to "all financial statements between the West Tennessee Diamond Jaxx and the city of Jackson, or any financial documentation relating to the financial agreement between the two parties, including but not limited to, any financial statement(s) demonstrating how the Jaxx have lost at least $150,000 a year over the last two baseball seasons. . . ." Once again, the City did not honor this request.

On January 26, 2005, the Gannett Satellite Information Network, the publisher of *The Jackson Sun*, Richard Schneider, executive editor of *The Jackson Sun*, Tajuana Cheshier, Jamie Page, and *The Jackson Sun* (collectively, "Petitioners") filed a lawsuit against the City pursuant to Tennessee's Public Records Act. The petition contained three counts; however, only Count I and Count II are at issue on this appeal.[2]

Count I of the petition alleged that, during 2004, the City, by and through the police department, compiled approximately 369 field interview cards after interviewing various individuals in Jackson, Tennessee. The petition noted that *Jackson Sun* reporter Tajuana Cheshier submitted to the City a Public Records Act request for the photographic images and documentary information obtained by the City incident to the field interviews. The petition claimed that the field interview cards were public records, and that the City violated the Public Records Act by declining to disclose them. The petition asserted that the City's failure to disclose the field interview cards was willful, and that the Petitioners were therefore entitled to attorney's fees under the Public Records Act.

Count II of the petition asserted that *The Jackson Sun* had made two requests to the City for financial information relating to the Diamond Jaxx baseball team and any notices of relocation. First, in the October 2004 letter from counsel for the Petitioners, the Petitioners requested disclosure of all notices of relocation that the City had received from the Diamond Jaxx ownership, Lozinak Baseball. Second, on December 12, 2004, *Jackson Sun* reporter Jamie Page submitted a public records request to the City for a Diamond Jaxx "Statement of Operations." The petition alleged that this "Statement" had been submitted to the City by representatives of the Diamond Jaxx. *The*

---

[2]Count III pertained to 911 emergency tapes relating to a criminal incident. The trial court held that the tapes were part of a pending investigation and were not subject to disclosure under the Public Records Act. This ruling has not been appealed.

*Jackson Sun* believed that the "Statement" detailed financial losses suffered by the Diamond Jaxx. The petition averred that the City had simply failed to respond to the request for the Diamond Jaxx financial documents.

The Petitioners sought mandatory injunctive relief and damages for the City's failure to disclose the field interview cards and its failure to respond to the requests for the Diamond Jaxx documents. The Petitioners also sought attorney's fees for the City's allegedly willful failure to disclose the documents requested. On January 26, 2005, the same day the petition was filed, Chancellor James Butler of the Madison County Chancery Court set the cause for an immediate hearing.[3]

In the City's response to the petition, the City asserted that the field interview cards sought by the Petitioners were privileged and therefore not subject to the disclosure requirements of the Public Records Act. As to the Diamond Jaxx financial records, the City asserted that the documents were private property, belonging to Lozinak Baseball. Consequently, the City argued, the Diamond Jaxx documents were not public records subject to disclosure under the Public Records Act.

On February 7, 2005, the Chancery Court held the show-cause hearing on the petition. At the hearing, the City admitted to receiving Tajuana Cheshier's July 2004 letter. Additionally, both parties stipulated that none of the requested records were provided to *The Jackson Sun*, or any of its agents, in response to the July, October, or December requests. In regards to the October 26, 2004 letter requesting that the City provide *The Jackson Sun* with any Diamond Jaxx relocation notices or related documents, the City's counsel argued that, at the time of the request, the City had not received any notice of relocation from Lozinak Baseball.

At the hearing, the City produced seventeen field interview cards, out of the estimated 369 in existence for 2004, as a representative sample of the cards for the court to review *in camera*. The City offered to produce all of the cards for *in camera* inspection, but the trial court found that the representative sample was sufficient to rule on the case.

The City also produced at the hearing a Notice of Termination of the Stadium License and Use Agreement between the City and Lozinak Baseball. The City informed the trial court that the Notice and the accompanying financial information were delivered to the City's Mayor on January 28, 2005, two days after the Petitioners filed the instant lawsuit. The City asserted that it was not in possession of the documents when the Petitioners requested access in their October 2004 and December 2004 letters.

---

[3]The Chancellor's scheduling of the hearing was in conformity with the requirements of Tennessee's Public Records Act, which provides: "Upon filing of the petition, the court shall, upon request of the petitioning party, issue an order requiring the defendant or respondent party or parties to immediately appear and show cause, if they have any, why the petition should not be granted." T.C.A. § 10-7-505(b) (1999).

The Notice of Termination letter, dated January 28, 2005, was from Robert Lozinak, the President of Lozinak Baseball, to Mayor Charles Farmer, the City's Mayor. The Notice invoked Article VI of the November 2002 Agreement between the City and Lozinak Baseball. It asserted that Lozinak Baseball had incurred a "Significant Operating Loss" during the 2004 fiscal year, and stated that it had sustained operating losses in excess of $150,000 for two consecutive years. As a result, the Notice stated, Lozinak Baseball was exercising its contractual right to terminate the Agreement, and intended to relocate the team following the conclusion of the 2005 baseball season. Pursuant to the Agreement with the City, Lozinak Baseball attached to the Notice financial documentation to support its asserted grounds for termination. The financial documentation attached to the Notice of Termination letter was the same financial information which the City had a right to inspect under Article V(N) of the Agreement.

At the hearing, the City produced the Agreement. The City also produced a February 3, 2005 letter to the City from the attorney for the West Tennessee Diamond Jaxx, admonishing the City not to disclose the financial documents that accompanied the January 28, 2005 Notice of Termination, essentially asserting the confidentiality clause of Article V(N)(ii) of the Agreement.

At the hearing, the trial court admitted into evidence the Agreement, the January 28, 2005 letter, and the February 3, 2005 letter. The trial court found that the letters were relevant to the issue of the City's willfulness in refusing to disclose the documents sought in the Petitioners' October and December requests.

At the outset of the show-cause hearing, the City argued that it should not be required to grant the newspaper's request for access to the field interview cards because they were protected under Rule 16 of the Tennessee Rules of Criminal Procedure, as well as a common-law law enforcement privilege. As to the Diamond Jaxx documents, the City acknowledged that the notice of relocation was a public document and did not contest its disclosure. It maintained, however, that the accompanying financial information, documenting the organization's losses over two consecutive years, was not yet subject to disclosure, because the Agreement granted the City a forty-five day period in which to elect to purchase the baseball team. To support this position, the City pointed to an exception to the Tennessee Public Records Act for records regarding the value of property which a governmental entity is considering acquiring.

The City then called four witnesses to testify about the field interview cards. The first witness was Commander Dennis Mays, division commander and legal advisor for the City of Jackson Police Department. Commander Mays asserted that the field interview cards are an integral part of the police department's investigative strategy. He explained that the cards are utilized to identify potential witnesses, suspects, and informants, as well as the geographic locations of criminal activity. Mays also testified that, if the cards were made public, they would reveal the department's tactics and procedures for gathering information such as the police department's strategic decisions to work specific geographic locations and to address particular crimes.

Commander Mays explained the process by which the cards are generated and how they are utilized. After a police officer encounters a citizen, the officer might memorialize the contact with a field interview card. Some of the encounters are voluntary, while others are *Terry* stops, based on reasonable suspicion. The cards record relevant information about the contact with the individual and also further the broader objective of facilitating the sharing of intelligence within the police department. Mays explained that the interview cards are "designed to be a central repository for information that officers acquire [while] performing their duties. . . . [The cards] allow Officer A to use Officer B's work product. . .to work his or her own cases. It's nothing different than if. . .two officers sit in a coffee shop and have a discussion."

Commander Mays testified that the field interview cards can retain their investigatory value long after the subject of the field interview card ceased being a suspect. For example, he said, it was plausible that there would be another incident in the same location at a later date, and the police would use the field interview cards to identify individuals who frequent the locale to find valuable sources of information.

The City next called to testify Lieutenant Mike Holt, the commander of the violent crimes unit of the Jackson Police Department. He explained that the City had been using the field interview cards to share intelligence since the early 1990's. According to Lieutenant Holt, the cards serve several purposes, but are especially valuable for identifying suspects. He noted that contacts often do not tell the police their correct name. Consequently, the interview cards, complete with biographical data and often including photographs, prove invaluable for identification purposes.

As an example, Lieutenant Holt explained how the field interview cards enabled police officers to apprehend a serial rapist:

A: We had a geographic area where [the rapes were] occurring and a period of time during the day that it was occurring. We started out by examining the field interviews that had been done historically in that area and also by examining field interviews that were done by teams of officers that were working in that area specifically armed with a description of the suspect. Through that we developed several possible individuals who had a criminal history that would be consistent—physical description that would be consistent that ultimately were eliminated because they were either incarcerated or eliminated by DNA. Ultimately we did have an individual that was field interviewed who. . .we worked from that field interview and determined that he had. . .not only [a] criminal history that was consistent, but a method of operation that was consistent in prior cases; and ultimately, using that field interview and his historical information and some other information obtained a search warrant, obtained blood which DNA was extracted and compared and identified the suspect.

* * *

Prior to him being stopped, he was not on the radar. He was not anybody that we had focused on in that investigation.

-7-

Q: So was this practice of [using] field interview cards an important part in solving that crime and preventing future rapes?
A: Absolutely.

Lieutenant Holt said that he believed that publishing the field interview cards would enable criminals to avoid detection, and by revealing potential witnesses, would lead to witness intimidation or physical harm to such witnesses.

The City's next witness was Lieutenant Patrick Willis, commander of the gang enforcement unit for the Jackson Police Department. Lieutenant Willis echoed the concerns raised by Lieutenant Holt that witnesses would be endangered by revealing their identities, and explained that gangs posed a particularly significant risk. In his experience with the gang enforcement unit, Lieutenant Willis said, gang retaliation against suspected informants is common. Willis also testified that the field interview cards are valuable for identifying gang members. Typically, he explained, gang members use street names such as "Little D" or "D Money," and gangs will give several individuals in their organization the same street name. Consequently, the field interview cards, complete with biographical data and photographs, are effective tools for identifying suspects as members of a gang.

The City's final witness at the show-cause hearing was Chief Richard Staples, the Chief of the Jackson Police Department. Chief Staples reiterated that the field interview cards are utilized to "memorialize the contact that a police officer has with an individual who he has reasonable suspicion to believe may be involved in some criminal act," and that the cards are used to identify potential witnesses and develop sources for information. He asserted that the police have been sharing this type of information "forever," and the field interview cards have proven to be an effective tool for sharing information. Chief Staples shared the fears expressed by previous witnesses, that disclosing the cards to the public could endanger witnesses and informants, and chill the public's willingness to disclose information to the police.

On February 23, 2005, the trial judge sent the parties a letter setting forth his rulings, findings of fact, and conclusions of law. In the letter, the trial court found that: (1) the City was in possession of all of the documents the Petitioners requested; (2) the City rejected the Petitioners' requests for the field interview cards, and did not respond to the request for the Diamond Jaxx documents prior to the filing of the lawsuit; (3) there was no evidence in the record that any of the field interview cards sought by the Petitioners were part of an ongoing criminal investigation; (4) Tennessee's Public Records Act did not contain any exception or privilege as to any of the documents to which the Petitioners requested access; and, (5) public policy favors the right of citizens to access the records of governmental agencies. In response to the City's argument that the field interview cards are privileged from disclosure, the trial court stated:

[T]he courts have been vigilant in upholding [the] clear legislative mandate [of the Public Records Act], even in the face of serious countervailing considerations. The [City] in the incident case argues that the field interviews are work product and that if criminals have access to this work product, police work will be more difficult. It

-8-

should be noted, however, that while the legislature excepted all investigative records of the Tennessee Bureau of Investigation, the office of Tenncare Inspector General, and other specific exemptions, the legislature did not except investigative files of municipal police departments. While there have been forceful arguments in other cases from police departments. . .that subjecting these types of files to public scrutiny would result in greater reluctance of witnesses to criminal activity to talk with authorities, and to a concomitant reduction in the effectiveness of law enforcement, the courts have refused to create a public policy exception to the legislative mandate of access. The courts have emphasized that the Public Records Act provides that all agency records be open for inspection unless specifically exempted. When Tennessee Code Annotated § 10-7-503 was enacted by the 1957 legislature, it provided that 'all state, county and municipal records' shall be open for inspection 'unless otherwise provided by law or regulations made thereto.' In 1984, the legislature amended the statute to provide that 'all state, county and municipal records shall be open for inspection unless provided by state statutes.' By this amendment, the Court reasons that the legislature reserved to itself alone the power to make public policy exceptions to Tennessee Code Annotated Section 10-7-503 for municipal law enforcement files.

On this basis, the trial court ordered the City to immediately comply with the Petitioners' requests for access to the field interview cards and the Diamond Jaxx documents.[4] In addition, the trial court issued a permanent injunction requiring the City to respond in writing to all future written public records requests from *The Jackson Sun* or its agents, explaining whether the record sought would be produced and, if not, the basis for nondisclosure.[5] The trial court also ordered the City to pay the Petitioners' attorney's fees and costs. On February 28, 2005, this letter was incorporated into a final order. On March 28, 2005, the trial court issued another letter ruling in which it found, in part, that the City was not in possession of some of the Diamond Jaxx documents until after the lawsuit was filed. Nevertheless, the trial court assessed a total of $6,190 in attorney's fees, comprised of two separate awards as to each type of document not disclosed, against the City. This was also incorporated into an order. From these orders, the City now appeals.

On appeal, the City contends that the trial court erred in holding that the field interview cards are public records, available for public inspection under Tennessee's Public Records Act. Second, the City asserts that the trial court erred in finding that the City's failure to disclose the field interview cards and Diamond Jaxx documents was willful within the meaning of Tennessee's Public Records Act, and therefore erred in awarding attorney's fees against the City.

---

[4]As to the field interview cards, the trial court noted that there was "a substantial legal question . . . which ought to be settled . . . by a higher court."

[5]*The Jackson Sun* requested this injunctive relief in the complaint.

## II. STANDARD OF REVIEW

The facts pertinent to this appeal are not in dispute. Resolution of the issues on appeal requires interpretation of Tennessee's Public Records Act and application of the Act to the facts of the case. This presents a question of law. *Memphis Publ'g Co. v. Cherokee Children & Family Servs.*, 87 S.W.3d 67, 74 (Tenn. 2002). We review questions of law *de novo*, without any presumption of correctness in the trial court's findings. *Id*. Interpretation of the Public Records Act requires that this Court ascertain the intent of the General Assembly in enacting the Act, without restricting or expanding the applicability of the statute beyond its intended scope. *Id*. (citing *Owens v. State*, 908 S.W.2d 923, 926 (Tenn. 1995)).

## III. ANALYSIS

### A.    The Field Interview Cards

As to the field interview cards, the City argues that the trial court failed to consider a significant amendment to the Public Records Act. As noted by the trial court in its letter ruling, in 1984, the statute was amended to read that "all state, county and municipal records" shall be open for inspection "unless otherwise provided by state statutes," which was interpreted by the Tennessee Supreme Court as the legislature reserving "to itself alone the power to make public policy exception[s]" to the Act. *Memphis Publ'g Co. v. Holt*, 710 S.W.2d 513, 517 (Tenn. 1986). The City points out, however, that in 1991, after the *Holt* opinion was issued, the General Assembly again amended the Public Records Act. This amendment modified the Act to read that state, county and municipal records shall be open for inspection "unless otherwise provided *by state law*." 1991 Tenn. Pub. Acts 369. The City argues that this language broadens the exemption from disclosure, and that this broader exemption was not considered by the trial court.

Relying on this broader language, the City contends that the field interview cards fall within Rule 16(a)(2) of the Tennessee Rules of Criminal Procedure, which states that "this rule does not authorize the discovery or inspection of . . . internal . . . documents made by . . . law enforcement officers in connection with the investigation or prosecution of the case. . . ."

Additionally, the City argues that the field interview cards are exempt from disclosure pursuant to the common-law law enforcement privilege, which it asserts protects from disclosure law enforcement techniques and procedures, the identity of confidential sources and other persons involved in investigations, and otherwise prevents interference with an investigation. The City describes this as a qualified privilege, under which the public interest in nondisclosure is balanced against the need of the petitioner for access to the information. In this case, the City contends, the public interest in nondisclosure outweighs the media's need for access to the field interview cards.

Furthermore, the City contends that the field interview cards are protected under a common-law "informant privilege," described as a "sub-set" of the common-law enforcement privilege.

We consider first the genesis and evolution of Tennessee's Public Records Act. We then consider whether the field interview cards are exempt from the disclosure. After that, we will address the award of attorney's fees on the Diamond Jaxx documents.

## 1. Evolution of Public Records Act

The American public's right of access to information about its government is largely derived from an English tradition of a public right of access to, among other things, judicial records and proceedings. *See Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555, 566 (1980); *see generally* SIMON GREENLEAF, GREENLEAF ON EVIDENCE § 471 (15th ed. 1892). The English tradition of conducting public trials and permitting public access to public documents has a long history, traceable as far back as the Norman Conquest. *Richmond Newspapers*, 448 U.S. at 565; *see also* HAROLD L. CROSS, THE PEOPLE'S RIGHT TO KNOW 25 (Columbia Univ. Press 1953).

The importance of transparency in government proceedings was a fundamental tenet of American democracy established by our Forefathers. James Madison once wrote: "A popular Government, without popular information, or the means of acquiring it, is but a Prologue to a Farce or a Tragedy; or perhaps both. Knowledge will forever govern ignorance: And a people who mean to be their own Governours, must arm themselves with the power which knowledge gives." Letter from James Madison to W.T. Barry (Aug. 4, 1822), 9 WRITINGS OF JAMES MADISON (Hunt Ed. 1910) 103.[6]

In 1978, the United States Supreme Court acknowledged the existence of a common-law right of access. *Nixon v. Warner Communications*, 435 U.S. 589, 597 (1978). Shortly thereafter, the Supreme Court developed a strain of public access jurisprudence tying fundamental First Amendment rights to the right of public access to court proceedings and documents. *See, e.g.*, *Richmond Newspapers*, 448 U.S. 555; *Press-Enterprise Co. v. Superior Ct. of California*, 464 U.S. 501, 503 (1984); *Globe Newspaper Co. v. Superior Ct.*, 457 U.S. 596 (1982). The right of access was defined in legislation such as the federal Freedom of Information Act and its state derivatives. *See* 5 U.S.C.A. § 552 (West 2002).

Tennessee's Public Records Act, Tennessee Code Annotated § 10-7-101, *et seq.*, has been described as a codification of the public access doctrine. *Ballard v. Hertzke*, 924 S.W.2d 652, 661 (Tenn. 1996). Under the Public Records Act, public records are presumed open for public inspection. *See, e.g.*, *State v. Cawood*, 134 S.W.3d 159, 165 (Tenn. 2004); *Swift v. Campbell*, 159 S.W.3d 565, 570 (Tenn. Ct. App. 2004); *see also The Tennessean v. Electric Power Bd. of Nashville*, 979 S.W.2d 297, 305 (Tenn. 1998) (acknowledging the Public Records Act's "clear mandate in favor of disclosure"). The General Assembly directed that the Public Records Act "shall be broadly construed so as to give the fullest possible public access to public records." T.C.A. § 10-7-505(d) (1999). This presumption that documents are available for inspection is not absolute and may be overcome by a showing that the documents sought are not subject to the statute or are

---

[6]The Library of Congress bears a portion of this statement on an exterior wall of the James Madison Building.

otherwise exempt from disclosure. To overcome the presumption of access, the statute requires the government to justify nondisclosure of the records by a preponderance of the evidence. T.C.A. § 10-7-505(c) (1999); *Swift*, 159 S.W.3d at 570; *Thompson v. Reynolds*, 858 S.W.2d 328, 329 (Tenn. Ct. App. 1993).

Under the Public Records Act, only documents within the statutory definition of "public record" are required to be open for public inspection. The Public Records Act defines "public record" as "all documents, papers, letters, maps, books, photographs, microfilms, electronic data processing files and output, films, sound recordings, or other material, regardless of physical form or characteristics *made or received pursuant to law* or ordinance *or in connection with the transaction of official business* by an governmental agency."[7] T.C.A. § 10-7-301(6) (Supp. 2005) (emphasis added).

Tennessee Code Annotated §10-7-503 mandates that public records "shall at all times, during business hours, be open for personal inspection by any citizen of Tennessee, and those in charge of such records shall not refuse such right of inspection to any citizen, unless otherwise provided by state law." T.C.A. § 10-7-503(a) (Supp. 2005). This section has undergone a number of amendments that indicate the evolving legislative view of the scope of its mandate. In its initial form, the public records statutes excepted only two types of records from disclosure—medical records of patients in state hospitals and military records implicating the security of the United States. *Swift*, 159 S.W.3d at 571 (citing Act of Mar. 18, 1957, ch. 285, § 2, 1957 Tenn. Pub. Acts 932). Since 1957, an increasing number of specific exemptions and exceptions have been added to the Public Records Act. *Id.*

In addition, the language of the mandate in section 10-7-503(a) has undergone a transformation. As originally enacted, the statute permitted the nondisclosure of public records "whose confidentiality was 'provided by law or regulations made pursuant thereto.'" *Id*. (citing Act of Mar. 18, 1957, ch. 285, § 1, 1957 Tenn. Pub. Acts 932). In 1984, the exception was narrowed, permitting the nondisclosure of a public record only when a "state statute" made the record confidential. *Id*. (citing Act of May 17, 1984, ch. 929, § 1, 1984 Tenn. Pub. Acts 890).

The current version of the Act's mandate was enacted in 1991. The 1991 amendment broadens the category of documents which are exempt from the mandate of disclosure, stating that public records shall be open for inspection "unless otherwise provided by *state law*." T.C.A. § 10-7-503(a) (Supp. 2005). This change indicated that "statutes were not the sole source of exceptions from the public records statutes' disclosure requirements" and "broadened the permissible sources of exceptions from disclosure. . . ." *Swift*, 159 S.W.3d at 571. In the statute's current "state law"

---

[7]Part I of the Public Records Act sets out a separate definition of "records" which is different from the definition in Part III. *See* T.C.A. § 10-7-101 (1999). The Tennessee Supreme Court has determined that the definition in Part I of the Public Records Act was not intended to apply to other parts of the Act, and may be the result of a "'compiler's error, occurring in the renumbering of the 1980 edition of the Code.'" *Memphis Publ'g Co. v. Cherokee Children & Family Services, Inc.*, 87 S.W.3d 67, 75 n.6 (Tenn. 2002) (quoting *Creative Restaurants, Inc. v. City of Memphis*, 795 S.W.2d 672, 675 (Tenn. Ct. App. 1990)).

form, then, nondisclosure of a public record is justified when the document is protected under not only state statutes, but also the Tennessee Constitution, common law, state statutes, court rules, or administrative rules and regulations. *See, e.g.*, *Ballard*, 924 S.W.2d at 662; *Swift*, 159 S.W.3d at 571–72 (citing *Frye v. Blue Ridge Neuroscience Ctr., P.C.*, 70 S.W.3d 710, 713 (Tenn. 2002); *Tennessee Small Sch. Sys. v. McWherter*, 851 S.W.2d 139, 148 (Tenn. 1993); *Emery v. Southern Ry.*, 866 S.W.2d 557, 561 (Tenn. Ct. App. 1993); *Kogan v. Tennessee Bd. of Dentistry*, 2003 WL 23093863, at *5–6 (Tenn. Ct. App. Dec. 30, 2003)). Applying the broad "state law" exception in section 10-7-503(a), courts have held that a number of documents and information are exempt from disclosure under state law; examples include documents sealed by a protective order, *Ballard*, 924 S.W.2d at 662, and an attorney's work product, *Arnold v. City of Chattanooga*, 19 S.W.3d 779, 786 (Tenn. Ct. App. 1999).

The pre-1991 version of the Tennessee Public Records Act was interpreted by the Tennessee Supreme Court in *Memphis Publ'g Co. v. Holt*, 710 S.W.2d 513 (Tenn. 1986). In *Holt*, the Court considered the question of whether closed police investigative files were subject to disclosure under the Public Records Act and Rule 16(a)(2) of the Tennessee Rules of Criminal Procedure. The file sought to be examined in *Holt* related to the "Shannon Street Incident" in January 1983, in which occupants of a residence on Shannon Street in Memphis, Tennessee, took a police officer hostage. Eventually a shootout occurred; seven occupants of the residence and the hostage police officer died in the incident. There was a police investigation of the incident, which was later closed. *Id.* at 515.

In November 1984, nearly two years after the incident, a local newspaper sought access to the closed police investigative file. After access to the files was denied, the newspaper filed suit under the Public Records Act. In analyzing the statute, the *Holt* court noted that it mandated disclosure of all public records "unless otherwise provided by state statute." *Id.*

In addition to several other arguments, the defendant City sought to exempt the files from disclosure under Rule 16(a)(2) of the Tennessee Rules of Criminal Procedure, which states that it does not authorize the discovery and inspection of reports or internal documents of law enforcement officers "in connection with the investigation or prosecution of the case. . . ." The *Holt* court found the Rule inapplicable because the file at issue was a closed file, not pertinent to any pending or contemplated criminal investigation. *Id.* at 517.

The defendants urged the *Holt* court to adopt a public policy exception to the Public Record Act, arguing that disclosure of such police investigative files was contrary to public policy. In considering this argument, the court noted the 1984 amendment of Section 10-7-503, narrowing the exemption from disclosure by providing that all public records would be open for inspection "unless otherwise provided by state statute." *Id.* Interpreting the 1984 version of the Act, the court declined to adopt a public policy exception and held that "a public official can justify refusing a Tennessee citizen access to a governmental record only by proving by a preponderance of the evidence that the record in controversy comes within a statutory exemption." *Id.* at 517-18.

In this case, the trial court observed that the Public Records Act was amended in 1984 to provide that public records shall be open for inspection "unless provided by state statutes," and noted that the Tennessee Supreme court declined to adopt a public policy exception to the Act in *Memphis Publishing Co. v. Holt*. The trial court did not mention the 1991 amendment to the Public Records Act, and appeared to apply the 1984 version which was interpreted in *Holt*. This was erroneous. We must consider, then, whether the field interview cards are protected from disclosure through an exemption under state *law*, not limited to an exemption under state *statute*.

At the show-cause hearing in the trial court below, although the City argued that the field investigative cards could be used to investigate or deter crime, it did not introduce into evidence any proof that any of the cards were pertinent to an ongoing investigation at that time. Therefore, as in *Holt*, Rule 16 of the Tennessee Rules of Criminal Procedure would not be applicable. *Holt*, 710 S.W.2d at 517. We look, then, at whether the field interview cards are exempt from disclosure under some other "state law," considering first the common-law law enforcement privilege.

## 2. Law Enforcement Privilege

In this case, the City asks this Court to recognize the common-law law enforcement investigative privilege (hereinafter referred to as the "law enforcement privilege") as a common-law privilege in Tennessee, and to hold that it exempts the field interview cards from disclosure under section 10-7-503(a) of the Public Records Act. The law enforcement privilege shields from disclosure information that would be contrary to the public interest in the effective functioning of law enforcement. *Rosser v. City of Philadelphia*, 2005 WL 2205920, at *1 (E.D. Pa. 2005); *see United States v. Myerson*, 856 F.2d 481, 484 (2d Cir. 1988).

Rooted in the federal common law, the law enforcement privilege is derived from the executive privilege.[8] *See Black v. Sheraton Corp. of America*, 564 F.2d 531, 541–42 (D.C. Cir. 1977) (observing that the law enforcement privilege "asserted here shares with those typically labeled 'executive' a justification rooted in the need to minimize disclosure of documents whose revelation might impair the necessary functioning of a department of the executive branch."). Executive privilege is an often loosely-used term referring to several related, but distinct, privileges. 26A CHARLES ALAN WRIGHT & KENNETH W. GRAHAM, *FEDERAL PRACTICE AND PROCEDURE* § 5673 (2005). Given the nomenclature problems inherent in any discussion of executive privilege, we refer to executive privilege within the broader concept of governmental privileges.

In 1875, the United States Supreme Court, in *Totten v. United States*, explained: "It may be stated as a general principle, that public policy forbids the maintenance of any suit in a court of justice, the trial of which would inevitably lead to the disclosure of matters which the law itself

---

[8] The law enforcement privilege is also related to, and to some extent overlaps with, other privileges derived from the executive privilege, such as the investigative privilege, the investigatory file privilege, the state secrets privilege, the deliberative process privilege, and the government information privilege. *See, e.g., Boyd v. City and County of San Francisco*, 2o006 WL 1141251, at * 4-5 (N.D. Cal. May 1, 2006); *Raz v. Miller*, 389 F.Supp.2d 1057 (W.D. Ark. 2005); *Swift*, 159 S.W.3d at 578; and *In re Marriage of Daniels*, 240 Ill. App.3d 314, 329-33 (Ill. App. Ct. 1992).

regards as confidential, and respecting which it will not allow the confidence to be violated." ***Totten v. United States***, 92 U.S. 105, 107 (1875). Arguably, based in large part on the holding in ***Totten*** and this particular excerpt, a general acknowledgment emerged that an executive, or governmental, privilege to withhold various information from the public is necessary to effectively administer the Executive branch. ***See, e.g., United States v. Reynolds***, 345 U.S. 1 (1953); ***United States v. Nixon***, 418 U.S. 683 (1974); ***Carl Zeiss Stiftung v. V.E.B. Carl Zeiss, Jena***, 40 F.R.D. 318 (D.D.C. 1966); **compare** MARK J. ROZELL, *RESTORING BALANCE TO THE DEBATE OVER EXECUTIVE PRIVILEGE: A RESPONSE TO BERGER*, 9 Wm. & Mary Bill Rts. J. 541 (2000) **with** RAOUL BERGER, EXECUTIVE PRIVILEGE: A CONSTITUTIONAL MYTH 1 (1974) (arguing that the executive privilege does not have a Constitutional basis, but is instead "a product of the nineteenth century, fashioned by a succession of presidents who created 'precedents' to suit the occasion."). The executive privilege is not absolute, however; it is a qualified privilege, limited when the public interest so demands. ***Mathews v. Pyle***, 251 P.2d 893, 896–97 (Ariz. 1952). In applying the executive privilege in a given case, the trial court must weigh the public interest protected by the privilege against the public interests served by disclosure. ***Black***, 564 F.2d at 545. "A demonstrated, specific need for material may prevail over a generalized assertion of privilege, but the claimant must make a showing of necessity sufficient to outweigh the adverse effects the production would engender." ***Id***. (citations omitted).

The law enforcement privilege protects from disclosure the files of law enforcement officers when disclosure of the documents might impair the functioning of law enforcement.[9] ***Rosser***, 2005 WL 2205920, at *1; ***Morrisey v. City of New York***, 171 F.R.D. 85, 90 (S.D.N.Y. 1997); ***see also Tuite v. Henry***, 98 F.3d 1411, 1416-19 (D.C. Cir. 1996); ***In re Sealed Case***, 856 F.2d 268, 271-72 (D.C. Cir. 1988); ***Black***, 564 F.2d 531 (D.C. Cir. 1977); ***Tri-Star Airlines, Inc. v. Willis Careen***

---

[9]Recognized under federal common law, the law enforcement privilege is also codified, "incorporated into the various state and federal freedom of information acts." ***United States v. Myerson***, 856 F.2d 481, 483-84 (2d Cir. 1988); ***see also In re Marriage of Daniels***, 607 N.E.2d 1255, 1263-64 (Ill. App. 1992). For example, the Illinois Freedom of Information Act specifically exempts from inspection:

> Records compiled by . . . any law enforcement or correctional agency for law enforcement purposes or for internal matters of a public body, but only to the extent that disclosure would:
>> (i) interfere with pending or actually and reasonably contemplated law enforcement proceedings conducted by any law enforcement or correctional agency;
>> * * *
>> (iv) unavoidably disclose the identity of a confidential source or confidential information furnished only by the confidential source;
>> (v) disclose unique or specialized investigative techniques other than those generally used and known or disclose internal documents of correctional agencies related to detection, observation or investigation of incidents of crime or misconduct;
>> * * *
>> (vii) endanger the life or physical safety of law enforcement personnel or any other person; or
>> (viii) obstruct an ongoing criminal investigation.

Ill. Rev. Stat. 1989, ch. 116, par. 207(1)(c), cited in ***In re Marriage of Daniels***, 607 N.E.2d at 1263-64.

***Corp. of Los Angeles***, 75 F.Supp.2d 835, 840 (W.D. Tenn. 1999); ***In re the Marriage of Daniels***, 607 N.E.2d 1255, 1264–65 (Ill. App. Ct. 1992); ***Rafuse v. Stryker***, 813 N.E.2d 558, 562-63 (Mass. App. Ct. 2004); ***Van Hine v. Dep't of State of the Commonwealth of Pennsylvania***, 856 A.2d 204, 208–09 (Pa. Commw. Ct. 2004). "The purpose of [the law enforcement] privilege is to prevent disclosure of law enforcement techniques and procedures, to preserve the confidentiality of sources, to protect witness and law enforcement personnel, to safeguard the privacy of individuals involved in an investigation, and otherwise to prevent interference with an investigation." ***United States v. Myerson***, 856 F.2d 481, 484 (2d Cir. 1988).

The law enforcement privilege is not limited to ongoing investigations. ***Nat'l Cong. for Puerto Rican Rights v. City of New York***, 194 F.R.D. 88, 95 (S.D. N.Y. 2000); ***Morrisey***, 171 F.R.D. at 90 (citing ***Borchers v. Commercial Union Assur. Co.***, 874 F.Supp. 78, 80 (S.D. N.Y. 1995)). The privilege may apply to closed investigative files when disclosure of information may impair the ability of law enforcement officers to conduct future investigations or would otherwise endanger witnesses or officers. ***Black***, 564 F.2d at 546 (stating, "We reject plaintiff's contention that the public interest in nondisclosure can be disregarded simply because the principal investigation involved here has apparently been concluded."); ***Nat'l Cong. for Puerto Rican Rights***, 194 F.R.D. at 95; ***Morrisey***, 171 F.R.D. at 90.

The party asserting the law enforcement privilege must make a threshold showing that it applies. ***City of New York v. Beretta U.S.A. Corp.***, 222 F.R.D. 51, 66 (E.D.N.Y. 29004). To assert the privilege, courts have articulated three requirements which must be met:

> (1) there must be a formal claim of privilege by the head of the department having control over the requested information; (2) assertion of the privilege must be based on actual personal consideration by that official; and (3) the information for which the privilege is claimed must be specified with an explanation why it properly falls within the scope of the privilege.

***In re Sealed Case***, 856 F.2d 268, 271 (D.C. Cir. 1988) (citations omitted); ***see also United States v. Reynolds***, 345 U.S. 1, 7-8 (1953). The purpose of the conditions is to make certain that the privilege is asserted in a deliberate and reasonably specific manner. ***In re Sealed Case***, 856 F.2d at 271 (citing ***Friedman v. Bache Halsey Stuart Shields, Inc.***, 738 F.2d 1336, 1342 (D.C. Cir. 1984)).

As with many governmental privileges, the law enforcement privilege is qualified, rather than absolute; consequently, the court must weigh the public's interest in nondisclosure of the privileged documents against the petitioner's need for the information. ***Beretta U.S.A. Corp.***, 222 F.R.D. at 66; ***see also United States v. Leggett & Platt, Inc.***, 542 F.2d 655, 658–60 (6th Cir. 1976) (referring to a "qualified governmental official information privilege"); ***MacWade v. Kelly***, 230 F.R.D. 379, 381 (S.D. N.Y. 2005); ***Frankenhauser v. Rizzo***, 59 F.R.D. 339, 344 (E.D. Pa. 1973) (application of law enforcement investigative privilege balancing test in federal civil rights litigation). Courts have emphasized that "[t]he process of indentifying and weighing the competing interests cannot be avoided." ***In re Sealed Case***, 856 F.2d at 272.

The seminal case on the weighing of such competing interests is ***Frankenhauser v. Rizzo***, 59 F.R.D. 339 (E.D. Pa. 1973), a federal civil rights case in which the plaintiffs sought to recover damages for the death of a family member who was shot and killed by police. ***Id.*** at 339. The plaintiffs sought to discover witness statements and the reports of the extensive police investigation of the incident. ***Id.*** at 340-41. The ***Frankenhauser*** court recognized the need to balance the public interest in the confidentiality of the governmental information against the need of the litigant to obtain the information. ***Id.*** at 344. It stated:

> [W]hen executive privilege is asserted, the court must balance the public interest in the confidentiality of government information against the needs of a litigant to obtain data, not otherwise available to him, with which to pursue a non-frivolous cause of action. Needless to say, the balancing task will often be difficult and the ingredients of the test will vary from case to case. In the context of discovery of police investigation files in a civil rights case, however, at least the following considerations should be examined: (1) the extent to which disclosure will thwart governmental processes by discouraging citizens from giving the government information; (2) the impact upon persons who have given information of having their identities disclosed; (3) the degree to which governmental self-evaluation and consequent program improvement will be chilled by disclosure; (4) whether the information sought is factual data or evaluative summary; (5) whether the party seeking the discovery is an actual or potential defendant in any criminal proceeding either pending or reasonably likely to follow from the incident in question; (6) whether the police investigation has been completed; (7) whether any intradepartmental disciplinary proceedings have arisen or may arise from the investigation; (8) whether the plaintiff's suit is non-frivolous and brought in good faith; (9) whether the information sought is available through other discovery or from other sources; and (10) the importance of the information sought to the plaintiff's case.

***Id.*** This list has been described as "illustrative of the factors" to be considered in balancing the competing interests in a given case. ***In re Sealed Case***, 856 F.2d at 272.

The parties have cited only one Tennessee case that has addressed the law enforcement privilege, ***Swift v. Campbell***, 159 S.W.3d 565 (Tenn. Ct. App. 2004). *The Jackson Sun* characterizes ***Swift*** as having considered and rejected adoption of the law enforcement privilege in Tennessee; the City describes the ***Swift*** court as simply having declined to recognize it in that case. In ***Swift***, the court reviewed a federal public defender's attempt to gain access, under the Tennessee Public Records Act, to a state assistant district attorney general's files prepared in the defense of a writ of *error coam nobis* proceeding in a federal court. ***Swift***, 159 S.W.3d at 568–69. In resisting disclosure, the defendants argued that the documents were protected under, *inter alia*, Rule 16 of the Tennessee Rules of Criminal Procedure and the law enforcement privilege. ***Id.*** at 569-70. The ***Swift*** court first considered in detail the State's assertion that the documents were covered by the Tennessee Rule of Criminal Procedure 16(a)(2) exception of records from disclosure. Rule 16(a)(2) provides:

(2) *Information Not Subject to Disclosure.* Except as provided in (A), (B), and (D) of subdivision (a)(1), this rule does not authorize the discovery or inspection of reports, memoranda, or other internal State documents made by the district attorney general or other State agents or law enforcement officers in connection with the investigation or prosecution of the case, or of statements made by State Witnesses or prospective State Witnesses.

Tenn. R. Crim. P. 16(a)(2). The *Swift* court recognized the earlier holding in *Holt*, discussed *supra*, that Rule 16(a)(2) does not protect investigative files from disclosure unless the documents are relevant to a pending or contemplated criminal action. *Swift*, 159 S.W.3d at 574-75. After reviewing Tennessee cases interpreting Rule 16, the *Swift* court observed that those cases demonstrated that Tennessee courts would not permit a litigant to "use the public records statutes to obtain more discovery than Tenn. R. Crim. P. 16 permits when a criminal investigation is in progress, a criminal prosecution is pending, or when a prisoner is collaterally attacking his or her conviction in state court under the Post-Conviction Procedure Act." *Id.* at 575. Finding no reason to differentiate between state post-conviction proceedings and federal habeas corpus proceedings, the *Swift* court held that the documents were not public records subject to disclosure under the public records statute because they were covered by Rule 16 of the Tennessee Rules of Criminal Procedure. *Id.* at 576.

After holding that the documents were shielded from disclosure under Rule 16, the *Swift* court addressed briefly the State's alternate theory that the documents were also protected from disclosure under the law enforcement privilege:

> The State also invokes what it calls the 'law enforcement investigative privilege' as a basis for not releasing the records sought by Ms. Swift. It points to no Tennessee law, statutory or otherwise, that purports to recognize this privilege, and it likewise does not explain how the contours of this privilege differ from the provisions of Tenn. R. Crim. P. 16(a)(2). . . . Weighed against the clear state policy favoring the openness of governmental records, the State's efforts to convince us to recognize this new privilege fall short. . . . [W]e will leave it to the criminal courts to address this new privilege. When public records claims are involved, we will continue to rely on Tenn. R. Crim. P. 16.

*Swift*, 159 S.W.3d at 578 (citations omitted). In a footnote, the court noted that other jurisdictions which had recognized the privilege did so to prevent disclosure of law enforcement techniques, to preserve the confidentiality of sources, to protect witnesses and prevent interference with an investigation. The *Swift* court observed, "based on this description, there appears to be a substantial overlap between this privilege and Tenn. R. Crim. P. 16(a)(2)." *Id*. at 578 n.15.

In *Swift*, this Court clearly declined to recognize the law enforcement privilege. However, this portion of the Court's decision appears to be largely dicta, since it affirmed the trial court's judgment denying access to the documents based on Rule 16(a)(2). There was little discussion of

the policy considerations underlying the law enforcement privilege, and no indication that there were any documents at issue that would have been covered by the law enforcement privilege that were not also covered by Rule 16(a)(2). Under those circumstances, the *Swift* court understandably declined to adopt the privilege at that time, leaving it "to the criminal courts to address this new privilege." *Id.* at 578. In this case, however, we are squarely presented with the issue of disclosure of documents not covered by Rule 16. Therefore, we cannot leave it to the criminal courts to address another day, but must consider it now.

As noted repeatedly by this Court, and emphasized by the trial court below, the Public Records Act was intended to be broad, an "all encompassing legislative attempt to cover all printed matter created or received by government in its official capacity." *Swift*, 159 S.W.3d at 571 (quoting *Bd. of Edu. of Memphis City Schools v. Memphis Publ'g Co.*, 585 S.W.2d 629, 630 (Tenn. Ct. App. 1979)). Indeed, the Act itself mandates a broad construction "so as to give the fullest possible access to public records." T.C.A. § 10-7-505(d). In the face of this clear legislative policy, unless an exemption is clearly mandated, "we must require disclosure even in the face of 'serious countervailing considerations.' " *Swift*, 159 S.W.3d at 572 (quoting *Memphis Publ'g Co. v. City of Memphis*, 871 S.W.2d 681, 684 (Tenn. 1994)). Moreover, the recognition of privileges from disclosure is "strongly disfavored because they are in derogation of the search for truth." *In re Marriage of Daniels*, 607 N.E.2d at 1262. Because privileges work to "protect interests which are outside of the truth-seeking process," they must be strictly construed. *Id.*

Notwithstanding these weighty factors mitigating in favor of disclosure, courts have generally acted to prevent interference with the essential governmental function of criminal investigations. *Id.* Indeed, the importance of the oft-recited objectives of the law enforcement privilege can hardly be understated: preventing disclosure of law enforcement techniques and procedures, protecting witnesses and law enforcement personnel, guarding the privacy of those involved in investigations, and otherwise preventing interference with an investigation. *See United States v. Myerson*, 856 F.2d 481, 484 (2d Cir. 1988); *Black v. Sheraton Corp. of America*, 564 F.2d 531, 545 (D.C. Cir. 1977) ("[T]here is indeed a public interest in minimizing disclosure of documents that would tend to reveal law enforcement investigative techniques or sources."); *Otterson v. Nat'l R.R. Passenger Corp.*, 228 F.R.D. 205, 207 (S.D. N.Y. 2005); *In re Marriage of Daniels*, 607 N.E.2d at 1265.

Given the importance of the interests protected by the law enforcement privilege, we find that it must be recognized under Tennessee common law. *See In re Marriage of Daniels*, 607 N.E.2d at 1264 ("We . . . note that no other jurisdiction which has faced this issue has refused to

adopt or recognize the [law enforcement] privilege.");[10] *see also Black*, 564 F.2d at 542 (the privilege is "rooted in common sense as well as common law.")

We must address, however, the parameters of the law enforcement privilege. *The Jackson Sun* argues that information which is not part of a current, ongoing investigation should not be shielded from discovery, and notes that the City made no showing that the field interview cards were part of a current investigation. Indeed, it is undisputed that the field interview cards are separate from the files on matters under investigation; subjects of the cards may or may not be involved in an ongoing investigation as a subject, witness, source or informant. The law enforcement privilege, however, is clearly not restricted to only ongoing investigations; if it were, as noted in *Swift*, there would be little point to recognizing a privilege whose contours do not significantly differ from Rule 16(a)(2) of the Tennessee Rules of Criminal Procedure. *Swift*, 159 S.W.3d at 578 n.15. In a number of instances, the privilege is applicable to documents which are not necessarily files on the investigation of a specific suspect or a specific crime. *See, e.g.*, *MacWade v. Kelly*, 230 F.R.D. 379, 380-81 (S.D.N.Y. 2005) (plaintiff subway riders filed suit under Section 1983 to invalidate police program of randomly searching subway riders' backpacks in effort to detect and deter terrorism; information on the frequency and location of subway searches covered by law enforcement privilege); *Nat'l Cong. for Puerto Rican Rights*, 194 F.R.D. at 94 (plaintiff civil rights organization accused police of suspicionless stops of young black and Hispanic men, sought police memoranda on plans for deployment, identity of officers, law enforcement strategy and tactics; court held privilege applied to documents on investigatory techniques and strategies); *see also Black*, 564 F.2d at 546. Therefore, we hold that the common-law law enforcement privilege is not limited to ongoing investigations. *See Nat'l Cong. for Puerto Rican Rights*, 194 F.R.D. at 95 ("An investigation need not be ongoing for the law enforcement privilege to apply as 'the ability of a law enforcement agency to conduct future investigations may be seriously impaired if certain information is revealed'" (citations omitted)).

We hold that the law enforcement privilege is applicable to the field interview cards at issue in this case. At the show-cause hearing in the trial court below, Police Department supervisory personnel, including the Chief of the Police Department, the division commander, the commander of the violent crimes unit, and the commander of the gang enforcement unit, all testified based on personal knowledge, describing the information in the field interview cards and explaining how they were used to identify suspects, witnesses, informants, to gather information on the locations of criminal or gang-related activity, and how disclosure of the cards would give criminals information on police tactics and lead to intimidation or even physical harm to witnesses and informants.

---

[10] *But see Maclay v. Jones*, 542 S.E.2d 83 (W.Va. 2000), in which the West Virginia court stated that "West Virginia is not among the group of states that have chosen to recognize a qualified privilege for law enforcement investigatory materials." *Id.* at 85. The *Maclay* court went on to, however, in effect, apply the privilege, holding that when the trial court is asked to permit discovery of internal police investigatory materials, the materials would be disclosed only if the party's need for the materials "outweighs the public interest in maintaining the confidentiality of such information," and instructing the lower court to "consider whether any perceived adverse effects to the public interest in maintaining confidentiality can either be eliminated or reduced through the use of an appropriately drawn protective order." *See Maclay*, 542 S.E.2d at 90.

Clearly, the City has met the requirements for asserting the privilege. ***See Reynolds***, 345 U.S. at 7-8; ***In re Sealed Case***, 856 F.2d at 271.

At this point, then, "the court must balance the public interest in the confidentiality of governmental information against the needs of [the] litigant to obtain data, not otherwise available to him. . . ." ***Frankenhauser***, 59 F.R.D. at 344. At the hearing below, the City offered compelling testimony on several of the applicable factors, such as the extent to which disclosure would thwart law enforcement, the potential for harm to witnesses and informants resulting from having their identities disclosed and the degree to which the cooperation of persons interviewed would be chilled by such disclosure. From the record, we know that much of the information in the field interview cards is factual, although we do not know if some of it is evaluatory, such as the police officer's comments. Clearly, the lawsuit by *The Jackson Sun* is "non-frivolous and brought in good faith." ***Id.*** However, because the trial court did not recognize or apply the law enforcement privilege, the record does not include evidence on the importance of the field interview cards to the newspaper or whether the information sought is available from other sources. ***Id.***

Therefore, while the concerns raised by the City are grave and weigh heavily against disclosure, the record is insufficient for this Court to engage in the necessary weighing of the competing interests. In light of this, we must vacate the order of the trial court requiring the City to give the newspaper access to the field interview cards and remand the cause to the trial court for further proceedings consistent with this Opinion. In addition, in view of the above holding, the award of attorney's fees for the City's failure to disclose the field interview cards is reversed. All remaining issues as to the field interview cards are pretermitted.

### B.        The Diamond Jaxx Documents

The second issue the City raises on appeal is the trial court's award of attorney's fees to *The Jackson Sun* for the City's willful failure to respond to the requests for the Diamond Jaxx documents. The trial court's ruling was based in part on its finding that the City had no legal basis for refusing to respond to *The Jackson Sun's* repeated requests for the documents. After a hearing, the trial court awarded a judgment for attorney's fees to the Petitioners.

Tennessee Code Annotated §10-7-505(g) of the Public Records Act provides for the award of attorney's fees:

> If the court finds that the governmental entity, or agent thereof, refusing to disclose a record, knew that such record was public and willfully refused to disclose it, such court may, in its discretion, assess all reasonable costs involved in obtaining the record, including reasonable attorney's fees, against the nondisclosing governmental entity.

T.C.A. § 10-7-505(g) (1999). The requirement that the failure to disclose be willful and knowing is synonymous to a bad faith requirement. ***Arnold v. City of Chattanooga***, 19 S.W.3d 779, 789

(Tenn. Ct. App. 1999). Consequently, a good faith belief that the refusal to disclose is justified limits the availability of attorney's fees. *See The Tennessean v. City of Lebanon*, 2004 WL 290705, at *9 (Tenn. Ct. App. Feb. 13, 2004). If the withholding governmental entity acts with a good faith belief that the records are excepted from the disclosure requirements of the Public Records Act, an award of attorney's fees is not warranted. Tennessee courts will not impute to the government "a duty to foretell an uncertain juridicial future." *Memphis Publ'g Co. v. City of Memphis*, 871 S.W.2d 681, 689 (Tenn. 1994).

In this case, to determine whether an award of attorney's fees was proper, we must first ascertain whether there was in fact a violation of the Public Records Act with respect to the Diamond Jaxx documents. On October 26, 2004, the letter from counsel for *The Jackson Sun* to the City stated: "should the owners of the Diamond Jaxx provide the City with any 'notices of relocation,' that the City provide to *The* [*Jackson*] *Sun* copies of the notices, along with any related documents." It is undisputed that, at that time, the City had not yet received the requested documents from the team's owner, Lozinak Baseball. On December 14, 2004, a reporter from *The Jackson Sun* sent a letter to Mayor Farmer requesting "access to all financial statements between the West Tennessee Diamond Jaxx and the City of Jackson, or any financial documentation . . . including but not limited to, any financial statement(s) demonstrating how the Jaxx have lost at least $150,000 a year over the last two baseball seasons."

On January 26, 2005, this lawsuit was filed, alleging that the City willfully failed to disclose the Diamond Jaxx documents requested. The Notice of Termination and the accompanying financial information were delivered to the City two days later, on January 28, 2005. On February 3, 2005, counsel for the Diamond Jaxx sent the City a letter admonishing the City not to disclose the financial documentation, relying on the confidentiality clause in the Agreement. Both the January 28, 2005 Notice and the February 3, 2005 letter were produced at the February 7, 2005 show-cause hearing; the financial documentation was also produced at that time. The trial court ordered the City to produce the remaining Diamond Jaxx documents in its February 28, 2005 letter ruling. On March 28, 2005, the trial court issued another letter ruling in which it found, in part:

> With reference to the Diamond Jaxx documents, it is clear from the record that some fo the financial documents and the letter of intent were not in the possession of the [City] until after the lawsuit was filed. There was apparently other documents in the possession of the [City] relating to the Diamond Jaxx issue which they did possess, but which were not furnished until after the lawsuit was filed, although two requests had been made prior to the suit.

The trial court did not elaborate on which documents were in the City's possession prior to the filing of the lawsuit, but awarded attorney's fees on this issue in the amount of $3,085.

The Public Records Act states broadly that public records are to be "open for personal inspection by any citizen of Tennessee. . . ." T.C.A. § 10-7-503(a). The term "public record" is defined as "documents . . . made or received pursuant to law or ordinance or in connection with the

transaction of official business by any governmental agency." T.C.A. § 10-7-301(6). Under the express terms of the statute, then, the document becomes a public record when it is "made or received" by the governmental agency.

It is undisputed that the Diamond Jaxx documents in question were generated by Lozinak Baseball. Therefore, they became "public records" only when received by the City.[11]

As to each request made by *The Jackson Sun*, the City was required only to produce the public records responsive to the request which were in its possession at the time of the request. The first request by *The Jackson Sun* asked the City to give it access to any notices of relocation and related documents "should the owners of the Diamond Jaxx provide the City" with such documents. Under the language of the Public Records Act, the City was required to produce responsive documents in its possession at that time. No language in the Act indicates that a citizen, or a newspaper, is entitled to expect the governmental entity to retain a "continuing request" for responsive documents that may come into its possession in the future. Governmental entities receive innumerable requests for documents pursuant to the Act, ranging from documents related to highly publicized matters to mundane requests. The Act does not place upon the governmental entity the duty to continue indefinitely to look for responsive documents that may come into its possession at some point after the date it received the request.

In its March 28, 2005 letter, the trial court indicated that the City had "some" financial documents in its possession at the time of at least one of the requests by *The Jackson Sun*. The trial court did not identify the documents to which it referred. The City alleges that any of the financial information regarding the Diamond Jaxx would have fallen under the rubric of Tennessee Code Annotated § 10-7-504(a)(6), which exempts from disclosure "state agency records containing opinions of value of real and personal property intended to be acquired for a public purpose. . . ." Since the City was at the time considering acquiring the team, pursuant to the terms of its Agreement with Lozinak Baseball, the City argues, any documents in its possession at that time would fall within this exemption.

Since the trial court did not identify the documents it found to have been in the City's possession at the time of at least one of the requests by *The Jackson Sun*, we cannot know from the appellate record whether these documents were arguably subject to the exemption in section 10-7-504(a)(6). If the City withheld the documents based on a good faith belief that they were exempt from disclosure pursuant to this statutory provision, an award of attorney's fees would not be appropriate. *See Memphis Publ'g Co.*, 871 S.W.2d at 689.

Since we are unable on this record to determine whether the award of attorney's fees was appropriate as to any of the Diamond Jaxx documents, we must remand to the trial court on this issue

---

[11]There was no showing below, and the Petitioners do not argue on appeal, that Lozinak Baseball was "the functional equivalent of a governmental agency." *See Memphis Publ'g Co. v. Cherokee Children & Family Services, Inc.*, 87 S.W.3d 67, 79 (Tenn. 2002).

as well, for reconsideration and appropriate findings of fact. On remand, an award of attorney's fees would be warranted only for knowingly and willfully withholding documents responsive to the Petitioners' requests, without a good faith belief that the documents were exempt from disclosure, and only as to responsive documents in the City's possession at the time it received the request. On this basis, the award of attorney's fees as to the Diamond Jaxx documents must be vacated and the cause remanded for further proceedings on this issue.

In addition, the trial court issued a permanent and mandatory injunction requiring the City to respond in writing to all future written public records requests from *The Jackson Sun*, or its agents, explaining whether the record sought would be produced and, if not, the basis for nondisclosure. We find no authority under the Act for a permanent, mandatory injunction such as this. In view of our holding in this case, the injunction must be vacated as well. All other issues raised on appeal as to the Diamond Jaxx documents are pretermitted.

## IV.  CONCLUSION

The trial court's judgment ordering the City to disclose the field interview cards to the Petitioners is vacated and the cause remanded to the trial court for further proceedings on this issue. The award of attorney's fees to the Petitioners for the City's failure to disclose the field interview cards is reversed. The award of attorney's fees as to the Diamond Jaxx documents is vacated as well, and the cause remanded for further proceedings on this issue. Additionally, the trial court's mandatory injunction against the City is vacated. Costs of this appeal are taxed one-half against the Respondent/Appellant City of Jackson and one-half against the Petitioner/Appellees Richard Schneider, Tajuana Cheshier, Jamie Page, and the Gannett Satellite Information Network, and their sureties, for which execution may issue, if necessary.

_____
HOLLY M. KIRBY, JUDGE